**Ruth Ann GUINAN, Plaintiff,**

v.

**ROMAN CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, Defendant.**

**No. IP 98–16 C B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 7, 1999.

**846**

Irving Fink, Yosha Ladendorf Krahulik & Weddle, Indianapolis, IN, for plaintiff.

John S(Jay) Mercer, Wood Tuohy Gleason Mercer & Herrin, Indianapolis, IN, for defendant.

### *ENTRY AFTER BENCH TRIAL*

BARKER, Chief Judge.

This matter comes before the Court following a bench trial on April 1–2, 1999, in which Plaintiff, Ruth Ann Guinan (Guinan), claims that Defendant, Roman Catholic Archdiocese of Indianapolis (Archdiocese), violated the Age Discrimination in Employment Act (ADEA) by failing to renew her teaching contract.[1]  For the reasons

---

1.  Plaintiff originally had a contract claim as well, but it was dismissed on summary judg-    ment.  *See* Court's December 11, 1998 Entry.

discussed below, we find that Defendant did not violate the ADEA when it opted not to renew Plaintiff's teaching contract.

## I. *Findings of Fact*

The events giving rise to this litigation took place at All Saints Elementary School (All Saints), which is located here in Indianapolis. The Archdiocese owns All Saints and had employed Guinan as a teacher at the school for eleven years. During that time, she primarily taught the fifth grade and was employed under a series of successive one-year contracts (a standard arrangement at All Saints and other parochial schools, as tenure is not offered by the Archdiocese).[2] At the end of the 1995–96 school year, Guinan's employment at All Saints concluded when the Archdiocese, through Mary Pat Sharpe (Sharpe), the principal of All Saints, opted not to renew Guinan's teaching contract for the following school year.[3]

Sharpe's decision not to renew Guinan's contract came during a very difficult time for All Saints. Sharpe had been principal at the school less than a year[4] and was hired at a time when All Saints, an inner-city school, was suffering from a host of problems, including poor teacher moral, low test scores among the students, budgetary strains, and serious discipline concerns, to name just a few. By October 1995, the magnitude of the school's problems had become increasingly evident, prompting the Indiana Department of Education, through its division of Performance–Based Accreditation (PBA), to inform Sharpe that it would be re-evaluating the school's accreditation status because the students at All Saints had failed to meet the minimum expectations in Indiana Statewide Testing for Educational Progress (ISTEP) total battery scores, language arts proficiency scores, and mathematics proficiency scores. (Defendant's Exhibit L).[5] The PBA's evaluation process began with a preliminary visit by state officials to All Saints to determine the need for an on-site review, which is a four-day review of school operations culminating in the issuance of an accreditation determination and a written report. In December 1995, after the preliminary visit, PBA officials informed Sharpe that an on-site review would be conducted. The on-site review subsequently took place in February 1996. Based on the review, PBA could give either five-year, two-year or probationary accreditation to All Saints. Probationary status is viewed as a very serious problem; such an assessment is made only in the most exceptional situations. At the time of trial, for example, only nine of the approximately 2000 schools under PBA review were on probationary status. Not surprisingly, therefore, the PBA review was a matter of great importance both to Sharpe and the Archdiocese.

In March 1996, Sharpe received the PBA report, together with the devastating news that All Saints had been placed on probationary status.[6] The report justified the accreditation decision on several grounds, including (1) "[t]he staff has not realized its potential in providing a quality educational environment," and (2) "[c]reative solutions have not been sought to correct problems caused by lack of school funding, environmental problems, changing family structures, and community focus." (Defendant's Exhibit L). While upset by the report, Sharpe had no disagreement with the PBA assessments. She perceived All Saints as suffering from a variety of problems and believed that as

---

2. Guinan also taught social studies to fifth, sixth and seventh graders.

3. Plaintiff recognizes Sharpe as the sole decision maker for purposes of this litigation.

4. Sharpe had previously served at other Catholic schools as an assistant principal and a fifth grade school teacher.

5. An accreditation decision by the PBA must be ratified by the State Board of Education to be effective.

6. The PBA's decision was subsequently ratified by the State Board of Education.

principal it was her responsibility to bring the school back to five year accreditation status. In fact, Sharpe was determined to have the school off probationary status within a year, an ambitious goal by all measures.

Although Sharpe endorsed the PBA report and embraced its findings as a necessary first step to turning the school around, not everyone at All Saints shared her assessment. Guinan, in particular, expressed to Sharpe the belief that some of the PBA's concerns were unfounded. Sharpe took Guinan's comments to mean that Guinan was averse to making necessary changes and, given the brief history between the two educators (the 1995–96 school year was the first year Sharpe and Guinan had worked together), Guinan's comments were influential in shaping Sharpe's perception of Guinan.

During the PBA review process, Sharpe had begun to entertain the possibility that some of the teachers' contracts should not be renewed. Knowing that such changes might be difficult to implement, Sharpe sought counsel regarding contract renewals from Mickey Lentz (Lentz), who, as the associate director for administrative personnel at the Archdiocese, was in a supervisory position relative to all the parochial schools. At Sharpe's request, Lentz agreed to observe Guinan's classroom to make an independent assessment of Guinan's teaching. Lentz subsequently reported to Sharpe that she observed considerable disorder in Guinan's classroom and very little instruction taking place. Lentz also told Sharpe that whatever decisions Sharpe felt were necessary regarding contract renewals she would support them.

As already alluded to, the relationship between Guinan and Sharpe continued to be a bit bumpy. Guinan believed Sharpe did not like her, and Sharpe believed she did not have Guinan's full support. Tensions between the two women sometimes boiled over, as illustrated by a telephone conversation between them shortly after Guinan had been released from the hospital following a brief stay for a stress-related episode. During that conversation, Sharpe suggested that Guinan might want to consider teaching at a school less stressful than All Saints. Although Sharpe testified that she did not intend the comment to suggest that she wanted Guinan to leave, Guinan perceived the comment otherwise and reacted by screaming, crying and ultimately hanging up on Sharpe.

At trial, Sharpe did not explicate her personal feelings concerning Guinan, but did testify that, based on her observations of Guinan inside and outside the classroom, she disagreed with some of Guinan's teaching and disciplinary techniques.[7] She had observed Guinan as she "ripped students apart" by yelling at them and humiliating them in front of other students. Although Sharpe could not specify how often she witnessed such conduct, she testified that it happened often enough to make a lasting impression on her. Sharpe also observed Guinan lose emotional control when confronted with difficult or challenging disciplinary situations.

In April 1996, Sharpe prepared a written outline of her concerns about Guinan's performance, as well as Guinan's teaching strengths, for the purpose of evaluating whether Guinan ought to remain as a teacher at All Saints. (Defendant's Exhibits G, H). Sharpe listed seven strengths, including "cares very much for the children" and "has put alot [sic] of time and energy into fund raising," but also referenced nineteen weaknesses, including "unprofessional many times when dealing with principal, students, and teachers," "doesn't always treat students with respect," "has a problem with control," and "classroom is messy and not very stimulating." (Defendant's Exhibit G, H). At trial, when asked about specific examples of Guinan's weaknesses, Sharpe testified concerning, among other things, (1) the so-called "playground incident", (2) Guinan's relationship with Sarah Hodges and other students, and (3) Guinan's relationship with fellow teachers.

7. Guinan testified that Sharpe routinely visited her classroom approximately once a week.

The "playground incident" referred to a situation at All Saints when a student was knocked unconscious during a touch football game at recess. According to the testimony of Mark Nash (Nash), who was at the time the Dean of Students at All Saints, and Lillian Watson, the administrative secretary at All Saints, Guinan dealt with the situation in a highly emotional, panic-driven fashion: she yelled at students to return to their classrooms and barged into classrooms in an attempt to round up the students she believed to have been involved in the incident. Sharpe considered Guinan's actions extremely disruptive and inappropriate, contributing to the crisis rather than alleviating it, particularly since Nash, not Guinan, was the person responsible for student discipline.[8]

Testimony was also adduced regarding Guinan's difficulty disciplining with some of her more difficult students, particularly a young girl named Sarah Hodges (Hodges). Sharpe believed that Guinan displayed little patience with Hodges, often resorting to "put down" language in response to Hodges' behavioral problems. In fact, the conflict between Guinan and Hodges eventually reached a point where a school counselor had to be brought in to try to defuse the situation. Similarly, Sharpe believed Guinan from time to time failed to deal maturely with other teachers, as Guinan was known to say negative things, in particular about Mark Nash, and to give the silent treatment to teachers with whom she had disagreements.

Guinan's track record with most of Sharpe's predecessors had been generally acceptable. Praise was not universal, however. For example, Kathleen Tichenor (Tichenor), who was the principal at

All Saints from 1981 to 1988, testified that, during her tenure as principal, she had given Guinan negative evaluations for erratic behavior, maintaining a messy classroom, rarely staying after school, displaying a poor attitude about inner-city students, and not dealing with difficult students well.[9] While these comments do not reflect a typical personnel review of Guinan by Sharpe's predecessors, they are remarkably similar to the concerns expressed by Sharpe.

Apart from staffing concerns, Sharpe also faced administrative problems. Specifically, All Saints had a serious budget problem, including a $65,000 debt to the Archdiocese.[10] In late March 1996, Sharpe submitted her budget proposal for the 1996–97 school year—a proposal which included the salaries of all the teachers, including those whose contracts ultimately were not renewed. The approved budget also included the salaries of the ultimately non-renewed teachers.

In April 1996, Sharpe announced her decision not to renew the contracts of three teachers at All Saints: Guinan (age 52), Trudy Davis (age 52), and Jean Walker (age 45). Those teachers were replaced by Gail Strahle (age 32), Patricia Doan (age 41), and Karen Langdon (age 25). These personnel changes did impact favorably on All Saints' financial situation because the replacement teachers were paid less than the teachers who were not renewed. In terms of the ages of the faculty, the replacement teachers also were younger than those they replaced.

Sharpe informed Guinan on April 26, 1996 of her decision not to renew Guinan's contract. Although Guinan testified that

8. The Dean of Students was a recently created position, and Guinan testified that she did not know at the time that Nash had authority over such disciplinary matters. Although Guinan was unaware of Nash's responsibilities, Sharpe had not been apprised of that. In fact, Sharpe had every reason to believe that Guinan knew of Nash's authority because it had been fully explained to the faculty at a beginning of the school year meeting attended by Guinan.

9. Tichenor, however, did renew Guinan's teaching contract each year she was the principal at All Saints.

10. According to the testimony, while the Parish with which All Saints is affiliated is ultimately responsible for the debt, the school must do what it can as well to manage the financial situation successfully.

she was shocked by the news, she did not express to Sharpe a belief that the decision was motivated by her age. Even when she met with Mickey Lentz almost a month later, on May 19, 1996, Guinan, again, did not express any opinion that her contract non-renewal was age based.

Following the conclusion of the 1996 academic year, Guinan attempted unsuccessfully to obtain other employment as a school teacher. However, she has been quite successful in starting her own business as the owner and operator of day care centers, into which she has invested considerable sums of her own savings. Meanwhile, All Saints has been taken off probationary status, receiving the most favorable, five-year accreditation by the Indiana Department of Education.

## II. *Conclusions of Law*

■ Plaintiff asserts the narrow issue of whether the decision not to renew her contract was made because of her age (52 years old at the time), in violation of the Age Discrimination in Employment Act (ADEA). We do not attempt to decide whether Mrs. Guinan was a good teacher or whether we would have made the same administrative and personnel decisions as Mrs. Sharpe did. "Courts do not sit as 'super-personnel departments' charged with deciding whether an employer's decisions were 'right' or 'wrong'; our sole mission . . . is to decide whether the employee was discharged [ ] on the basis of criteria that Congress has deemed impermissible [in this case her age]." *N.L.R.B. v. Gatx Logistics, Inc.*, 160 F.3d 353, 357 (7th Cir. 1998). With this focus in mind, we turn to the merits of Plaintiff's age discrimination claim.

■ The ADEA prohibits an employer from discharging an individual because of her age. *See* 29 U.S.C. § 623(a)(1). A claim brought under the ADEA "must [establish] that age was 'a determining factor' " in the employer's decision to terminate employment. *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 393 (7th Cir.1998); *see also Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir.

1999). Although age need not be the sole reason for the discharge, plaintiff must show that, but for her employer's motive to discriminate against her on the basis of her age, she would not have been discharged. *See Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 393 (7th Cir.1998); *Testerman v. EDS Technical Products Corp.*, 98 F.3d 297, 301 (7th Cir. 1996) (stating that "the relevant inquiry is whether age 'tipped the balance,' that is, whether age was a 'but for' cause of the decision to fire the plaintiff.").

A plaintiff may prove age discrimination via direct or indirect evidence. In this case, Guinan has no direct evidence tending to prove that she was discriminated against on the basis of her age. Instead, she relies on the indirect, burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for Title VII claims and later adapted for other types of discrimination cases such as ADEA claims. *See Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 571–72 (7th Cir.1998).

The familiar framework established in *McDonnell Douglas* necessitates a three-step inquiry. *See Adreani*, 154 F.3d at 393. First, plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. *Id.* If plaintiff makes out a prima facie case, a presumption of discrimination arises, and the burden shifts to defendant to come forward with evidence of a "legitimate, nondiscriminatory reason" for discharging plaintiff. *Id.* Even though the burden of production shifts to defendant, however, the ultimate burden remains with plaintiff to persuade the trier of fact that defendant intentionally discriminated against her based upon her age. *See Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir. 1996). Finally, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not

its true reasons, but were a pretext for discrimination." *Id.*

■ A plaintiff is successful in presenting a prima facie case when she demonstrates that she was in the protected age group (40 years of age and older, *see* 29 U.S.C. § 631(a)), was performing her job satisfactorily, and suffered an adverse employment action. The plaintiff must also establish that younger employees situated similarly to the plaintiff were treated more favorably. *See Fisher v. Wayne Dalton Corp.,* 139 F.3d 1137, 1141 (7th Cir.1998). The Supreme Court has clarified that an ADEA plaintiff who shows that she was replaced by someone "substantially younger" need not prove that the replacement is outside the protected class. *See O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *see also Carson, v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996) (per curiam) (discussing *O'Connor*).

Here, Guinan establishes a prima facie case by establishing that she was in the protected age group at the time of her non-renewal (age 52), she suffered an adverse employment action (non-renewal of contract), and she was replaced by a younger teacher. Next, the Archdiocese has satisfied its burden by establishing that Guinan's contract was not renewed because its decision maker—Mary Pat Sharpe—believed Guinan had performance difficulties. Thus, the burden shifts back to Guinan to demonstrate that the Archdiocese's stated reason for its decision not to renew Guinan's contract is a pretext for age discrimination.

■ "There are two methods of showing pretext: 'Pretext may be established directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible.' " *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 919 (7th Cir.1996) (*quoting Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1039 (7th Cir.1993)). Pretext does not require that the facts presented by the defendant as the reason for its employment action not be true, only that they not be the reason. *See id.*

■ Guinan has not introduced any direct evidence of pretext. We must therefore determine whether Guinan has succeeded in showing that the Archdiocese's proffered reason is not credible. "This showing may be made by introducing evidence that demonstrates that (1) the proffered reason[ ][is] factually baseless; (2) the proffered reason[ ][was] not the actual motivation for the discharge; or (3) the proffered reason[ ][was] insufficient to motivate the discharge." *Wolf,* 77 F.3d at 920; *see also Adreani,* 154 F.3d at 395. As previously noted, however, it is not sufficient for Guinan to show that the Archdiocese acted incorrectly or undesirably by failing to renew her contract; rather, Guinan must show that the Archdiocese, i.e. Sharpe, did not honestly believe in the reason it (she) gave for not renewing Guinan's contract. *See McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992).

Guinan relies primarily on the following facts to establish pretext: (1) two other All Saints teachers within the protected class were also replaced by younger teachers at the same time as Guinan, (2) prior to the nonrenewal decision, Sharpe never communicated to Guinan any concerns about her teaching, (3) previous All Saints' principals had given Guinan good evaluations, (4) the PBA report did not specifically criticize Guinan, (5) All Saints was experiencing financial difficulty and the replacement teachers hired by Sharpe saved the school tens of thousands of dollars, and (6) Sharpe was a new principal, still insecure in the performance of her new duties and threatened by the older teachers.

■ The fact that two other teachers within the protected class were discharged and replaced by younger teachers during the same time period as Guinan constitutes the strongest evidence before us in support of Plaintiff's case. Unfortunately for

Plaintiff, however, such evidence, standing alone, is not sufficient to demonstrate pretext. More is necessary to fill the evidentiary gaps and establish that Sharpe's decision was motivated by Guinan's age. Such evidence has not been presented to us, however. In fact, the suggestion that Sharpe made the employment decisions based on Guinan's age or that of the other non-renewed teachers is undercut by the fact that she did hire Robert Johnson (Johnson) at the beginning of the 1995–96 school year when he was 51 years old. Although Johnson ultimately resigned, at trial he testified that his resignation was prompted by performance issues—not his age.

An examination of the circumstances surrounding the individuals involved in these employment decisions lends additional credence to the conclusion that Sharpe's decision not to renew Guinan's contract was not age based. First, Gail Strahle (Strahle), who, at age 32, replaced Guinan, was described as a highly qualified and experienced teacher, with which description Plaintiff does not apparently take issue, other than to emphasize that Strahle lacked Guinan's many years of experience. Although Strahle did not testify at trial, the record clearly establishes that she was a qualified teacher with an extensive educational background (holding both Bachelor of Science and Master of Arts degrees in Education) and approximately six years of experience as an elementary school teacher. (Defendant's Exhibit O). Nothing about Strahle's credentials or ability as presented to the Court suggests that age had anything to do with her hire.

Sharpe also testified that performance issues—not age—motivated her decision not to renew the contract of Jean Walker, one of three teachers over 40 years old not to have her contract renewed for the 1996–97 school year. Walker did not testify at trial, and no contrary evidence was adduced at trial indicating that Sharpe's decision regarding Walker's contract renewal was motivated by age.

Trudy Davis, another teacher within the protected age class not to have her contract renewed for the 1996–97 school, was Guinan's closest friend at All Saints. Plaintiff called Davis as a witness purportedly to establish a pattern of age-related employment decisions by Sharpe. Unfortunately for Plaintiff, such evidence was not forthcoming. According to the uncontroverted evidence, in February 1996, Sharpe placed Davis on a "growth plan" in an attempt to correct some deficiencies Sharpe perceived in Davis' performance. Davis knew Sharpe was not happy with her performance and acknowledged that Sharpe had given her a poor evaluation shortly before she was told of the non-renewal decision. The non-renewal decision, therefore, was not inconsistent with Sharpe's previous actions. Moreover, apparently Davis did not believe initially that the non-renewal decision with regard to her contract was age based; sometime after she learned of the decision, however, she did contact an attorney. There is no direct evidence that the decision with regard to Davis was age related.

Hence, although the age-related statistics that accompany Sharpe's staffing decisions may, by themselves, be sufficient to raise a judicial eyebrow, a more probing examination of those situations clearly indicates that the decisions not to renew Guinan's contract and, so far as we can tell, the other two teachers' contracts were not age based.

Plaintiff further attempts to demonstrate that her alleged poor performance is a pretext by presenting evidence that Sharpe did not seriously criticize Guinan's performance until she told Guinan that her contract would not be renewed. Plaintiff infers too much from this evidence. The testimony clearly establishes that Sharpe's management style was to praise good performance and not to criticize bad performance unless absolutely necessary. Consistent with this style, Sharpe refrained from presenting Guinan with a recitation of the weaknesses she perceived until the non-renewal decision was made, at which point the reasons for that decision obvious-

ly had to be disclosed. Although Sharpe was known to discuss performance problems with some teachers (e.g. Trudy Davis and Robert Johnson), evidence that she did not have such a discussion with Guinan does not bolster Plaintiff's pretext argument, since it is clear that Sharpe's approach with Guinan was consistent with her general management style. Moreover, Plaintiff's characterization of the facts is not altogether accurate. The evidence established that Sharpe was not uncritical of Guinan prior to the non-renewal and she certainly did not heap praise upon her. She apparently simply elected not to stress to Guinan what she perceived to be Guinan's inadequacies as a teacher until the time of nonrenewal of her contract.

■ Neither does the fact that Sharpe's predecessors generally gave Guinan favorable formal evaluations establish pretext. Formal, written, year-end-type evaluations often do not reflect fully candid assessments by the principal, as illustrated by the testimony of Kathy Tichenor. In any event, the prior evaluations of Guinan in several instances mirror the favorable comments that Sharpe also made about her teaching, but then fail to contain the criticisms Sharpe has made. This lack of direct conflict between Sharpe's comments and those of her predecessors (at least in their formal evaluations) undercuts the notion that Sharpe's stated opinions about Guinan were not sincerely held. Finally, the only former principal to testify, Kathy Tichenor, voiced criticisms of Guinan that were remarkably similar to Sharpe's criticisms. From all of this, we conclude that Sharpe's predecessors may have been more lenient in their formal evaluations of Guinan, that Guinan may have performed differently under their leadership, that Sharpe may have been more demanding of her teachers because of the PBA report, or that Sharpe simply may have perceived Guinan's performance as a teacher differently than did her predecessors. These contrasts in the evaluations, on whatever

basis they are explained, do not establish a pretext from which age discrimination can be inferred.

■ Next we address the PBA report, which was the source of much rancor and disagreement at All Saints during the 1995–96 school year. The report and the PBA's accreditation determination were cited by Sharpe and others as major catalysts for employment decisions made that year, including Sharpe's decision not to renew Guinan's contract. Plaintiff maintains, however, that the PBA determination could not possibly have motivated the decision not to renew her contract because (1) the report does not name specific teachers, and (2) the problems cited in the report were largely confined to concerns with the physical facility—not the individual teachers.

Plaintiff's contentions land wide of the mark. The PBA report was not limited merely to an assessment of the physical facilities at All Saints or, as Plaintiff correctly points out, of specific teachers. Rather, the report assessed whether the school as a whole provided students with a competent and safe educational experience. Within that broader scope, the report justified its accreditation decision, in part, on the fact that "[t]he staff has not realized its potential in providing a quality educational environment." (Defendant's Exhibit L). That such a conclusion by the State Department of Education would motivate Sharpe to make staffing changes is by no means far-fetched or suspicious. In fact, it is entirely consistent with the other evidence presented during the trial regarding Sharpe's management approach and her decision not to renew Guinan's contract. Although no single teacher was specifically cited in the report, Sharpe clearly believed that Guinan was one of the people who were referenced generically as being the source of the problems outlined in the report and that reference provided a reasonable and appropriate basis for her to be replaced.[11] Plaintiff fails to demon-

---

11. Plaintiff points out that she was still teaching when the All Saints' students' ISTEP

scores improved. This fact, however, does

strate that Sharpe's belief otherwise lacks credibility or that it was an insufficient basis to motivate her decision to release Guinan.

■ Plaintiff next maintains that the decision not to renew her contract was motivated by a desire to hire less expensive teachers, due to All Saints' budget crisis. Initially, we note that firing an employee solely to reduce salary costs is not necessarily age discrimination; compensation is typically correlated with age, but the relation is not perfect. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125–26 (7th Cir.1994); *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). In any event, the evidence adduced at trial does not establish that All Saints' budget crisis motivated Sharpe's decision not to renew Guinan's teaching contract. David Eddington, a former president of All Saints school board, who was involved in preparing All Saints' budget during the Spring of 1996, testified that no one, including Sharpe, discussed the option of not renewing teacher contracts as a means of saving money. In fact, so disapproving was he of that idea that, had Sharpe proposed such a plan, Eddington, himself, would have suggested the non-renewal of Sharpe's contract. The content of Sharpe's budget proposal and its timing are consistent with Eddington's testimony. Nothing in the specifics of the budget proposal indicated a plan or intention by Sharpe not to renew any teacher's contract; in fact, the proposal actually included the salaries of the subsequently non-renewed teachers. Moreover, the budget proposal was submitted prior to Sharpe's decision not to renew the contracts. The record is simply devoid of any evidence linking the decision

to release Guinan to All Saints' fiscal condition.

Finally, Plaintiff's counsel theorized in both his opening and closing statements that Sharpe's decision was prompted by feelings of insecurity and being threatened by older, more experienced teachers. No direct evidence was presented to substantiate that theory, however. No one testified that Sharpe evidenced such insecurity nor was there evidence that Sharpe seemed threatened or intimidated by older teachers. Our own assessment of Mrs. Sharpe, based on her appearance as a witness at trial, belies the fact that she was likely driven by such feelings of inadequacy in the performance of her administrative responsibilities at All Saints. Counsel's argument, of course, was not evidence, so we need not consider it further.

### III. *Conclusion*

It was made patently obvious at trial that the 1995–96 school year was a very difficult one for everyone at All Saints and in particular those involved in this litigation. All Saints' accreditation had been placed on probationary status, thus clouding its reputation and rendering its future uncertain. As All Saints' first-year principal, Sharpe accepted responsibility for turning the situation around in an expedited fashion. To that end, Sharpe made the decision not to renew the contracts of three teachers, including Guinan, believing that those teachers had demonstrated performance problems and were also averse to the kinds of changes that she believed were necessary to improve the school and return it to full accreditation. Whether Sharpe's judgments were accurate or appropriate is not for us to decide. Our task is simply to determine whether, based on

---

not negate the sincerity of Sharpe's belief that Guinan contributed to the problems outlined in the PBA report. Sharpe's concerns regarding Guinan's relations with other teachers, with difficult students, and with Sharpe herself are unaffected by this fact. In addition, Guinan was also teaching when the scores were low enough to prompt the PBA review, so the improvement in those scores likely did

not impact Sharpe's individual assessment of Guinan. In short, although the PBA review in part seems to have triggered Sharpe's evaluation of her staff, the ultimate decision to release Guinan resulted from a number of performance issues which were not mitigated, much less eliminated, by the improvement in the students' ISTEP scores.

the evidence before us, Sharpe honestly believed that Guinan's contract should not be renewed for reasons related to deficiencies in her performance as a teacher at All Saints and whether that belief motivated her decision to release Guinan. We find that Sharpe's decision not to renew Guinan's contract was not motivated by Guinan's age and that the decision was instead motivated by Sharpe's sincerely-held viewed that Guinan suffered from performance problems. Having failed to establish otherwise by a preponderance of the evidence, Plaintiff cannot prevail in her claims against Defendant. Accordingly, we find Defendant *NOT LIABLE* and Judgment shall be so entered.