In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4261

Joseph L. Simmons,

Plaintiff-Appellant,

v.

Chicago Board of Education,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CV 5451--John W. Darrah, Judge.

Argued September 25, 2001--Decided May 10, 2002

Before Rovner, Diane P. Wood, and Evans,
Circuit Judges.

Diane P. Wood, Circuit Judge.  Joseph
Simmons became the first African-American
treasurer of the Chicago Board of
Education in October 1995, shortly after
his unsuccessful run for city alderman.
Less than nine months later he was
demoted. He sued the Board claiming that
his demotion was illegally based on his
race and political activities. The Board
counters that it terminated Simmons
essentially for micromanaging his office,
in direct contravention of the orders of
his supervisor. The district court found
that Simmons had produced no evidence
that the Board's stated reason was
pretextual and therefore granted its
motion for summary judgment. We agree
that Simmons has not produced enough to
demonstrate a genuine issue of fact about
pretext and therefore affirm.

I

   Simmons was hired as treasurer in
October 1995. His immediate supervisor
was the Board controller, Andrew
Gilchrist. Above Gilchrist in the chain
of command were chief fiscal officer Ken
Gotsch and chief executive officer Paul
Vallas. As treasurer, Simmons supervised
five separate divisions, including the
Investments Division, which was

responsible for investing Board funds. Actual trades were normally made by the lead trader, Pam Jurgensen, who reported directly to Simmons. On any given day, Board traders conducted between five and 100 transactions.

Earlier in 1995, Simmons had mounted an unsuccessful race for Chicago alderman against 18th Ward incumbent Thomas Murphy. A week after Simmons was hired, Murphy called Vallas to complain about the selection. The gist of Murphy's complaint was that Simmons had illegally posted signs throughout the 18th Ward during the period leading up to the election and then had not removed them afterwards. This oversight cost the taxpayers money, since city workers had to devote time to taking down those signs. Murphy thought this indicated that Simmons would not make a fiscally responsible treasurer. Vallas informed Murphy that he was unaware of Simmons's campaign and expressed surprise that he had not learned of this fact during the interview and application process. In fact, Simmons had disclosed his aldermanic campaign to Gotsch and hisdeputy, Charles Burbridge, but that information apparently was not passed along to Vallas. Vallas later informed Simmons at a public meeting of the Board that "Alderman Murphy is not a big fan of yours." In addition, sometime after Simmons was demoted, Vallas bumped into Murphy at City Hall and mentioned that Murphy had been correct about Simmons.

Frictions developed within the treasurer's office soon after Simmons was hired. Jurgensen at times refused to cooperate with Simmons and told him that she had never worked for an African-American before. Simmons complained to his superiors that Jurgensen was initiating trades that contradicted Board policy and his weekly planning directives. Gotsch did not respond to these complaints with any action against Jurgensen. Simmons also hosted an off-site office Christmas party, leaving only one worker to cover phones. This infuriated City Treasurer Miriam Santos, who used the incident as an excuse to argue that she (as ex officio treasurer of the Board) needed more direct supervision of the Board Treasury Department. Vallas agreed to move Jurgensen and two other white employees

from the Board's Pershing Road facility to City Hall.

One of Simmons's primary responsibilities was to help implement the trading and investment portions of a new Investment Policy that Vallas had pushed through soon after taking the helm at the Board. Under the policy, the treasurer is "responsible for all transactions undertaken and shall establish a system of controls." The policy lists specific investments and trades that require advance approval from the chief fiscal officer and also states that "the investment authority rests with the Chicago Public Schools as delegated by the Chief Fiscal Officer."

In order to carry out that task, Simmons developed a new system of controls for trades, under which he demanded that treasury staff receive pre-approval for all transactions either at regular strategy meetings or by telephone prior to consummating an individual trade. For the traders, this meant the onerous task of notifying Simmons prior to the execution of any of the up to 100 trades each day. This in turn put the Board at the risk of losing money when the market moved during the often lengthy delays.

On April 8, 1996, Burbridge wrote a memo clarifying Simmons's role in approving trades. The memo stated that "The investment policy does not require the Treasurer to approve each individual trade in a security prior to its execution. Subordinate employees are expected to execute trades in accordance with strategies. The Treasurer is expected to monitor their activity retrospectively as part of the system of controls regulating investments to insure compliance with the strategy and policy . . . . The Treasurer is not involved in actual trading." The memo also warned that failure to comply would result in disciplinary action.

Simmons responded with a memorandum to Gotsch, Burbridge, and Gilchrist that laid out his concerns with the "interpretation of the Investment Policy, the recent investment approval pattern and practice, and the [April 8] memo." Simmons indicated that he understood the authority Gotsch had delegated to him, basically reciting from the April 8 memo,

but he also sought to justify his system of prior controls. He expressed confusion about how his system could have contributed to the alleged problems in the timely execution of trades and noted that he had at times denied approval for trades he viewed as inconsistent with the Investment Policy. He alluded to the need for his tight controls to prevent possible bankruptcy, although he neverexplicitly stated that he would not comply with Burbridge's directive.

Notwithstanding his opinion that the criticism of his system was ill-advised or ill-informed, Simmons claimed that after he received Burbridge's memo, he took a completely hands-off approach to trading. Gotsch, Burbridge, and Gilchrist remembered things differently; they claimed that Simmons ignored the memo and continued to delay and prevent trades, resulting in further loss of funds to the Board. Effective June 20, 1996, Simmons was demoted to a policy analyst position; he was replaced by a white female. A year later, the treasury staff, who had been moved to City Hall, returned to the Treasurer's new location.

II

We review the district court's grant of summary judgment de novo. Johnson v. Zema Sys. Corp., 170 F.3d 734, 742 (7th Cir. 1999). All reasonable inferences will be drawn in favor of the party opposing the motion, and that party may attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits. Maldonado v. U.S. Bank, 186 F.3d 759, 769 (7th Cir. 1999). Simmons asserts that the district court erred in refusing to consider certain facts stated in his affidavit. We need not explicitly resolve this dispute, since we are reviewing the judgment de novo and will consider Simmons's affidavit to the extent it does not contradict other evidence in the record. See Russell v. Acme-Evans Co., 51 F.3d 64, 67 (7th Cir. 1995).

To prevail on his race discrimination claim, Simmons must show either direct evidence of discriminatory motive or intent or rely on the indirect burden-shifting method outlined in McDonnell Douglas v. Green, 411 U.S. 792 (1973). Simmons has focused on the McDonnell

Douglas approach. This means that Simmons must present evidence tending to show: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. Id. at 802. If he meets this burden, the Board must provide a legitimate, nondiscriminatory reason for his demotion. At that point, the burden returns to Simmons to present evidence that the reasons offered by the Board are actually a pretext for discrimination. Id. at 804.

The district court found that Simmons had failed to establish either that he was meeting the Board's legitimate expectations or that similarly situated employees were treated more favorably. In our review of this decision, we will assume for the sake of argument that Simmons has met his initial burden and pass directly to the question of pretext. Rummery v. Illinois Bell Tel. Co., 250 F.3d 553, 556 (7th Cir. 2001). We make this assumption not because we are convinced that Simmons has established a prima facie case, but because the issue of satisfactory job performance, which lies at the heart of this dispute, must be analyzed in detail at both stages of the McDonnell Douglas test and it is therefore simpler to run through that analysis only once. See Gordon v. United Airlines, Inc., 246 F.3d 878, 886 (7th Cir. 2001).

The Board has certainly produced evidence of a legitimate, nondiscriminatory reason for Simmons's demotion: its dissatisfaction with Simmons's policy of pre-approval of all trades and his subsequent insubordinate failure to comply with Gotsch's directive to change that policy. Simmons must therefore show that the Board's reason is pretextual, which he can do either by pointing to a discriminatory reason that more likely motivated the Board or by demonstrating that the proffered explanation is not worthy of belief. Debs v. Northeastern Ill. Univ., 153 F.3d 390, 395 (7th Cir. 1998).

Simmons has offered no evidence that race discrimination is what was really motivating the Board. He claims that

because Jurgensen stated that she had never worked for an African-American before and complained about him constantly to his superiors, her racial animus somehow infected the decision to replace him. But statements by nondecisionmakers cannot satisfy a plaintiff's burden of proving discrimination, Larimer v. Dayton Hudson Corp., 137 F.3d 497, 500 (7th Cir. 1998), and Simmons offers nothing but speculation to connect Jurgensen's views with the actions of the ultimate decisionmakers. Simmons also claims in his affidavit that he "and others" believed Burbridge was a racist, but he offers no support for this other than assertion. One of his own witnesses, Bennett Currie, stated that some Board employees who were treated better were white, but others belonged to racial minorities. Tellingly, Simmons himself believed that Gotsch and Vallas, the two men responsible for his demotion, were not prejudiced against him because of his race. Finally, Simmons cites as evidence the fact that three white employees were transferred out of his office and returned a year after he left. But Simmons admitted the transfer was madebecause the City Treasurer requested more direct supervision over the Board's trading staff, a decision she was entitled to make as ex officio treasurer of the Board; once again, this falls far short of evidence tending to indicate that Simmons's race played any role in the move.

Simmons's only other hope of proceeding is to point to evidence showing that the Board's claim that he was demoted for insubordination is unworthy of belief. Despite Simmons's continued insistence that he had to approve trades as a fiscal duty to the Board, the Investment Policy is clear that it is Gotsch as chief fiscal officer, and not Simmons, who has ultimate investment authority. Gotsch was perfectly within his rights to determine that Simmons's approval of individual trades was both unnecessary and wasteful, delaying the timely execution of trades and distracting Simmons from the broader policy and strategic goals the Board wanted its treasurer to implement.

The only evidence Simmons has offered to contest the Board's accusation is his own affidavit. Simmons claims that he did

comply with the April 8 memo by thereafter taking a hands-off approach to trading. But it is unclear why this affidavit, standing alone, should persuade a trier of fact that Gotsch's version of events, supported by Vallas, Burbridge, and Gilchrist, is unworthy of belief. And it is worth recalling that what matters is Gotsch's confidence that Simmons would follow the more supervisory policy Gotsch envisioned: it does not matter if Simmons himself knew that he meant to toe the line in the future, if Gotsch genuinely believed he would not. See Olsen v. Marshall & Ilsley Corp., 267 F.3d 597, 602 (7th Cir. 2001) (issue is not whether employer's evaluation of employee was correct but whether it was honestly believed). Simmons also notes that neither Gotsch nor Burbridge responded to his reply memo, which he characterizes as a request for clarification. Gotsch and Burbridge may not have seen it as such, however; the reply states only that Simmons understood the Board Investment Policy and knew that he was not to require prior approval of trades. It is unclear what in these statements was intended to serve as a request for clarification. On the other hand, the memo expresses Simmons's strong disagreement with Gotsch's interpretation of the policy, which may have further weakened his supervisors' confidence that Simmons would do as they wished.

Simmons's admitted prior policy of micromanagement, which slowed down Board trades and risked significant monetary loss, combined with the tone of the memorandum itself and Simmons's later deposition testimony that he felt he was ultimately responsible to the Board (as opposed to Gotsch) for his trading and investment decisions amount to strong evidence on the Board's side of a nondiscriminatory reason why Gotsch might have removed him from the treasurer position. On the other hand, Simmons has produced no written documentation or testimony from other Treasury employees to cast any doubt on the Board's charges, and the tone of his reply memo, which argued among other things that his controls were necessary to prevent bankruptcy, causes us to question exactly what Simmons means by a "hands off approach." Under these circumstances, he has shown no evidence of pretext, and the district court's grant of summary

judgment to the Board was proper.

III

Simmons also contends that the Board violated his civil rights under 42 U.S.C. sec. 1983 because it demoted him in retaliation for his run for alderman. A municipal agency such as the Board can be liable under sec. 1983 for violating a person's civil rights through: (1) an express municipal policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority. Kujawski v. Board of Commissioners, 183 F.3d 734, 737 (7th Cir. 1999); City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (opinion of O'Connor, J.). However, liability requires more than the fact that a low level supervisor took some action that was not later reversed by a policymaker. Compare Praprotnik, 485 U.S. at 130. One way or another, the policy must be shown to be that of the municipality itself. See McMillian v. Monroe County, 520 U.S. 781, 784 (1997); Gernetzke v. Kenosha Unified Sch. Dist. No. 1, 274 F.3d 464, 468 (7th Cir. 2001). In this case, the parties agree that final policymaking authority rested with Vallas. See 105 ILCS 5/34-3.3. The district court concluded that the undisputed evidence showed that Vallas neither caused nor ratified the decision to demote Simmons.

This case differs somewhat from the typical ratification fact pattern. Normally, the plaintiff alleges that her immediate supervisor has unconstitutionally muzzled her free speech through a demotion or termination, and the defendants rely on the fact that no higher level individuals were aware of the unconstitutional basis of that job action. See Kujawski, 183 F.3d at 736; Praprotnik, 485 U.S. at 117. Here, in contrast, Simmons is indeed arguing that the higher level policymaker, Vallas, had an unconstitutional motive for dismissing him. Therefore, if there is any evidence indicating that Vallas played a role in Simmons's demotion and acted unconstitutionally, a trial would be necessary to determine whether the Board was liable for his actions.

The district court found that Simmons

had produced no evidence that Vallas played a role in the demotion, and that Gotsch alone made the decision. This conclusion, in our view, overstates the matter. First, Vallas was well aware of the decision to hire Simmons and his placement in a high profile position. Within a week of Simmons's hiring, Vallas had ordered his public relations department to research news reports on Simmons's aldermanic campaign and had directed Simmons to prepare a memo listing his qualifications. Thus, unlike Praprotnik or Kujawski, where ranking policymakers argued they were entirely unaware of the alleged speech activities of a low-level employee, Vallas had full knowledge of Simmons's political forays.

Vallas also issued the order to move members of Simmons's staff to City Hall after the Christmas party incident, an incident that Gotsch thought was blown out of proportion by Vallas and Santos. This action again shows fairly direct involvement by Vallas in basic personnel decisions within the Treasury Department and casts doubt on his claims of complete deference to Gotsch on such matters. Finally, Vallas admitted that all final personnel actions had to be approved by him and that he had an active role in creating the new policy analyst position to which Simmons was transferred after he was dismissed as treasurer. Such evidence would clearly permit a jury to find that Vallas was involved enough in the transfer action to have had the opportunity to visit a constitutional injury on Simmons, and the district court's finding that Gotsch must have fired Simmons on his own authority is therefore error.

That, however, does not save the day for Simmons. He still must make out a prima facie case of political motivation by proving "that his conduct was constitutionally protected, and that the protected conduct was a substantial factor in the decision to transfer him." Garrett v. Barnes, 961 F.2d 629, 632 (7th Cir. 1992); see also Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977). If he can do so, the Board may still prevail by showing by a preponderance of the evidence that there was a legitimate non-political reason for his termination. Nelms v. Modisett, 153 F.3d 815, 818 (7th Cir. 1998). There is

no dispute that running for political office is an activity protected by the First Amendment, but to survive summary judgment Simmons must present evidence that his campaign against Murphy was a substantial factor in his ouster.

Simmons has little to point to in support of his claim that Vallas demoted him for his political activities. First, in response to Murphy's phone call, Vallas ordered Simmons to compose a memo listing his qualifications as treasurer, and Simmons feels this response reflected a lack of support for the new treasurer. Under the circumstances, however, Vallas's action seems like a perfectly reasonable attempt to head off a potential attack by an influential city politician against a newly hired employee. Furthermore, Vallas permitted Simmons himself to draft the memo, and Simmons does not contend that his qualifications or lack thereof had any role in the demotion decision eight months later.

The only other evidence Simmons points to are three comments made by Vallas. The first occurred at a public Board meeting where Vallas, upon being introduced to Simmons, announced "Alderman Murphy is not a big fan of yours." Simmons says this remark made him uncomfortable and embarrassed, but it is impossible to infer that Vallas's utterance of this understatement veiled some determination that Vallas would later use this fact to remove Simmons from his job. In his second comment, made three months after Simmons was removed, Vallas announced in a meeting that he would remove any employee "not doing their job . . . even if they are Joe Simmons." This statement too provides no evidence that Vallas removed Simmons for his aldermanic run. In fact, it bolsters a conclusion that Vallas removed Simmons for insubordination and was willing to take the flak for that decision. The final statement is a passing remark Vallas made to Murphy sometime after Simmons's demotion, in which Vallas indicated that Murphy had been right about Simmons. But this comment merely proves that Vallas now concurred with Murphy that Simmons had not made a good treasurer and offers no indication as to why Simmons failed to make the grade.

In cases where plaintiffs have prevailed on political motivation claims, they have offered far more evidence than this, such as a pattern of decisions based on political factors, Felton v. Board of Comm'rs, 5 F.3d 198, 201 (7th Cir. 1993), or direct testimony from someone other than the plaintiff that the defendant wanted to rid the division of a political opponent. Nekolny v. Painter, 653 F.2d 164, 168-69 (7th Cir. 1981). Vallas was aware of Simmons's political activities eight months before the demotion, and Gotsch, whom Simmons admits was also involved, knew of the campaign when he hired Simmons. Cf. McClure v. Cywinski, 686 F.2d 541 (7th Cir. 1982) (defendant prevailed despite his comments several months earlier that plaintiff should not be so politically active or he would "get rid of him later.").

Finally, even if Simmons could make out a prima facie First Amendment claim, the Board has offered a legitimate, nondiscriminatory reason for his demotion--his refusal to comply with Gotsch's directives and continued interference with daily trading activities. As we noted in our discussion of Simmons's race discrimination claim, supra at 7, Simmons has offered no evidence other than his own affidavit to contradict the legitimacy of the Board's position, and that is clearly insufficient. For all these reasons, the district court was correct to grant the Board summary judgment on Simmons's First Amendment claim.

IV

Simmons has not offered sufficient evidence to allow a finder of fact to conclude that the Board dismissed him for an impermissible reason, rather than because of his failure to follow a satisfactory system for executing trades and his insubordinate refusal to comply with his supervisor's directives. We therefore Affirm the judgment of the district court.