**Sharon WALKER, Plaintiff,**

v.

**BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM and David Markee, Chancellor of the University of Wisconsin–Platteville, Defendants.**

No. 03–C–66–C.

United States District Court, W.D. Wisconsin.

Jan. 7, 2004.

David E. Rohrer, for Plaintiff.

Michael J. Losse, Assistant Attorney General, Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for monetary, declaratory and injunctive relief, plaintiff Sharon Walker contends that defendants David

Markee and the Board of Regents of the University of Wisconsin System refused to renew her contract because of her race and sex and in retaliation for exercising her First Amendment rights. Plaintiff brings her claims under 42 U.S.C. §§ 1981 and 1983 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

I conclude that there are genuine issues of material fact with respect to plaintiff's race and sex discrimination claims. A reasonable jury could find the reasons articulated by defendants for terminating plaintiff are pretexts for discrimination. With respect to plaintiff's retaliation claims, I conclude that three of the five statements relied on by plaintiff are matters of public concern and are protected by the First Amendment. However, with one exception, plaintiff has failed to adduce sufficient evidence to allow a reasonable jury to infer that her speech motivated defendant Markee's decision. Accordingly, defendants' motion for summary judgment will be granted in part and denied in part.

■ Before setting forth the undisputed facts, there are a number of preliminary issues that I must address. First is plaintiff's motion to strike the affidavits of Ann Lydecker, Chancellor of the University of Wisconsin–River Falls, and George Brooks, Associate Vice–President for Human Resources of the University of Wisconsin system. In these affidavits, Lydecker and Brooks give their "expert" opinion on the issue "whether a 'reasonable' chancellor could nonrenew the contract of an assistant dean in the circumstances of [this] case, and especially given the tenuous nature of plaintiff's employment." Dfts.' Br., dkt. # 46, at 2. Plaintiff argues that the affidavits should be stricken because Brooks's and Lydecker's opinions are neither relevant nor reliable.

I agree with plaintiff that a third party's assessment of defendants' reasonableness is not relevant, at least for the purpose of defendants' motion for summary judgment. As defendants themselves recognize in their briefs on the merits, it does not matter whether defendant Markee's decision not to renew plaintiff's contract was reasonable. Title VII, § 1981 and § 1983 do not prohibit foolishness or caprice, only discrimination and retaliation for exercising federally protected rights. The Court of Appeals for the Seventh Circuit has held repeatedly that a plaintiff cannot prove an employer's discriminatory intent by adducing evidence that its decision was "mistaken, ill considered or foolish." *Jordan v. Summers,* 205 F.3d 337, 343 (7th Cir.2000); *see also Grayson v. O'Neill,* 308 F.3d 808, 820 (7th Cir.2002) ("[W]e are not concerned with the correctness or desirability of reasons offered for employment decisions."); *Grube v. Lau Industries,* 257 F.3d 723, 730 (7th Cir.2001) ("A pretext for discrimination means more than an unusual act; it means something worse than a business error."); *Kulumani v. Blue Cross Blue Shield Association,* 224 F.3d 681, 685 (7th Cir.2000) (pretext "means a dishonest explanation, a lie rather than an oddity or an error"); *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson,* 212 F.3d 976, 979 (7th Cir.2000) ("Title VII is not a 'good cause' statute."). If a plaintiff may not buttress her case by demonstrating the objective unreasonableness of the employer's actions, it follows that a defendant is similarly barred from showing nondiscrimination with evidence that its decision was carefully considered or wise. It is notable that defendants have failed to cite any case in which a court held that expert testimony on an employer's reasonableness was appropriate in a discrimination case.

At most, Brooks's and Lydecker's opinions would go to credibility, which cannot be considered on summary judgment. *Morfin v. City of East Chicago,* 349 F.3d 989, 999 (7th Cir.2003). Thus, at this

stage of the proceedings, it is unnecessary to decide whether Brooks's and Lydecker's testimony could be relevant for any purpose. Because Lydecker's and Brooks's opinions may be ignored for the purpose of summary judgment, plaintiff's motion to strike will be denied as unnecessary. If and when defendant indicates its intent to call Brooks and Lydecker as witnesses at trial, plaintiff may move to bar their testimony. Defendants will then have to explain how evidence on the objective reasonableness of their decision is relevant when the ultimate question in this case relates to their subjective intent.

■ Second, defendants have filed a motion asking the court to take judicial notice of the transcripts of plaintiff's hearing before the State of Wisconsin Personnel Commission. Presumably, defendants are asking the court to take judicial notice of the testimony itself and not the facts on which the testimony is based. (Defendants could not argue seriously that all of the testimony during the hearing was "not subject to serious dispute," as required by Fed.R.Evid. 201(b); *see General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074 (7th Cir.1997).) Courts may take judicial notice of the record of an administrative proceeding. *Fornalik v. Perryman,* 223 F.3d 523, 529 (7th Cir. 2000). Defendants have provided the court with certified copies of the transcripts and plaintiff has not opposed defendants' motion. Accordingly, I will take judicial notice of the transcript of the hearing before the personnel commission.

Third, defendants argue in their reply brief that plaintiff's responses to their proposed findings of fact did not comply with the court's procedures to be followed on summary judgment. Specifically, defendants argue that in many cases, plaintiff did not limit her responses to citing evidence that put defendants' proposed fact into dispute. Instead, she introduced new facts that were not directly responsive to defendants' proposed fact. Defendants are correct that this court's procedures do not permit parties to propose new facts in their responses to proposed factual findings. However, I note that many of defendants' proposed findings of fact were also deficient because they did not include a citation to a page in the record. *See Johnson v. Cambridge Industries,* 325 F.3d 892 (7th Cir.2003) ("district courts ... are not required to scour every inch of the record for evidence"). To the extent that either side's submissions did not comply with this court's procedures, I have not considered them. *Ziliak v. AstraZeneca LP,* 324 F.3d 518 (7th Cir.2003) (when parties fail to comply with district court's summary judgment procedures, proper response is to disregard nonconforming submissions).

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

### A. *Plaintiff's Tenure Under Defendant Markee's Predecessor*

Plaintiff Sharon Walker began working at the University of Wisconsin–Platteville in 1994 as the assistant chancellor for student affairs. She is African–American. Before coming to the University of Wisconsin, plaintiff was the chief student affairs officer at Kentucky State University, the assistant dean of students at Iowa State University and the dean of students and vice president for student affairs at Morris Brown College. She was not terminated from any of these positions.

From the time of plaintiff's hire until 1996, Robert Culbertson was the chancellor of the University of Wisconsin. Culbertson appointed plaintiff and was her immediate supervisor. Defendant Board

of Regents of the University of Wisconsin System was plaintiff's employer.

The job description for plaintiff's position provided:

The Assistant Chancellor for Student Affairs is the chief administrative officer of the Division of Student Affairs and as such manages and directs the various services, programs, and policies for students that contribute and/or support the educational objectives of U.W.-Platteville. The person will serve the University community as an educator, manager and mediator.

. . . . .

The Assistant Chancellor for Student Affairs is responsible for the effective management of all departments within the Division. The individual who occupies the position is expected to provide leadership and supervision for the division's directors, facilitate programs that meet the needs of a diverse population, work cooperatively with the Student Senate and other student organizations, encourage student involvement in the life of the campus, and promote a campus environment of learning.

Plaintiff's appointment document states that her principal assignment was "administration of the University of Wisconsin–Platteville Office of Student Affairs." Plaintiff's position was a full-time limited appointment. A limited appointee serves at the pleasure of the appointing officer.

Culbertson gave plaintiff merit increases each year. In Culbertson's view, plaintiff did what he had asked her to do. Culberton extended plaintiff's contract to 1996, then to 1997 and finally to July 31, 1999. Culbertson told plaintiff that she had "done an outstanding job for this university in the short time that you have been with us." He wrote, "You have done a spectacular job and I consider you a valuable person, colleague and friend." In February 1996, he wrote, "Thank you very much for your hard work, dedication to task and effort to bring our student affairs units to standards expected in University settings."

## B. *Defendant Markee Replaces Culbertson*

Defendant David Markee became chancellor of the university in August 1996, a few months after Culbertson had extended plaintiff's contract to 1999. Before coming to the University of Wisconsin, defendant Markee was the vice-president of student affairs at the University of Northern Arizona.

Katherine Lyall is the president of the University of Wisconsin system. She supervises the university chancellors within the system. She told Markee when he was hired that "the campus was divided" and "morale was very low." She wanted him to bring the campus together.

Defendant Markee believes that it is important to recruit nontraditional students. When he first came to the university, the admissions office was performing this function, but Markee wanted to reorganize the offices so that the student affairs office was primarily responsible for recruiting nontraditional students. He believed that the "student affairs professionals were the best to do that work."

## C. *Plaintiff's Relationship with Defendant Markee*

In plaintiff's first meeting with defendant Markee, he told her that he wanted to do something with recruitment and he asked her about the relationship between the division of student affairs and the department of admissions and enrollment management. In addition, he told her that Ralph Curtis, the vice chancellor and provost of the university, had commented that plaintiff "micromanaged." However, Curtis does not recall saying that plaintiff had a problem with micromanagement.

Within a month or two after he began work, defendant Markee perceived that morale was low in the student affairs division. He thought that "the student affairs people" were not optimistic or positive. He was also concerned about low enrollment. He wanted to analyze the organizational structure and increase efforts for enrollment management.

Defendant Markee also wanted to change the positions of many of the university's administrators. For example, Markee wanted Michael Viney, who was plaintiff's assistant, to switch positions with Rich Egley, who was the director of student housing. On several occasions in September, October and November 1996, Markee met with plaintiff to discuss how her division could be reorganized. During these discussions, defendant Markee told plaintiff that he wanted her to reduce the number of people reporting directly to her. Plaintiff raised some concerns about defendant Markee's proposed changes. In November, defendant Markee told plaintiff that he accepted her recommendations and would implement them in the reorganization plan. If Markee had not agreed with plaintiff's suggestions, he could have declined to adopt them.

Soon after, the North Central Accrediting Association completed its ten-year review of the university. In its final report, the association gave the office of student affairs a favorable review.

In December 1996, defendant Markee called a retreat for the university's top administrators. Among other things, he announced that the department of admissions and enrollment management would be moved to the office of student affairs. (Previously, the department of admissions and enrollment had been part of the division of academic affairs.) Richard Schumacher, the assistant chancellor for admissions and enrollment management, would report to plaintiff. The reorganization took effect in February 1997.

Defendant Markee's reorganization plan did not reduce the number of people reporting directly to plaintiff. After the reorganization, plaintiff supervised 12 employees, at least one more than before. Defendant Markee learned that part-time employees with no significant budget responsibilities were reporting directly to plaintiff. He believed that too many people were reporting to plaintiff, causing unnecessarily lengthy meetings and taking up too much of plaintiff's time. Markee wanted groups to be represented by one lead person who could report to plaintiff.

In April 1997, defendant Markee asked several top administrators, including plaintiff, to write out five "productivity indicators" as well as ten significant accomplishments. Among her productivity indicators, plaintiff listed "bi-weekly meetings of Student Affairs Directors" and "monthly conferences with individual Program Directors." Among her significant accomplishments, plaintiff listed "divisional reorganization."

During the evaluation conference in May 1997, defendant told plaintiff that the year had gone well. He did not suggest any areas that needed improvement or question any of the accomplishments that plaintiff had listed in her self-evaluation. In November 1997, defendant Markee told plaintiff that she would receive a $3300 raise, which included a base adjustment of $824. Ultimately, plaintiff received a raise of $4150. This amount is comparable to the raises her peers received. For example, the assistant chancellor for business affairs, Steve Zielke, received a raise of $4400 and the assistant chancellor for university advancement, Patrick Hundley, received a $4090 raise. Raises for the assistant chancellors are based on their performance.

In late November or early December 1997, defendant Markee began to consider not renewing plaintiff's contract. In a December meeting with plaintiff, defendant Markee told her, "You know, we're not getting along." He then told her that her staff accused her of "micromanaging," that Al Thompson (one of the employees plaintiff supervised) had complained about her and that she had not demonstrated leadership in a situation involving Sandra Stacy, an administrator whom defendant Markee had evaluated independently. (The parties dispute most of the facts surrounding the reasons for the evaluation and plaintiff's involvement in the situation.) Finally, he told her that she should be involved in the community and that he wanted her "to do something with recruitment." When plaintiff asked what he meant, he responded, "Well, I'm not sure. But I want you to do something with recruitment." Plaintiff told defendant Markee that she was not interested in being a recruiter.

In a letter dated January 8, 1998, defendant Markee wrote that he would like to meet with plaintiff "about a management plan that allows key administrators in student services to feel more responsible and effective at managing their areas." He summarized the "key issues" he would like to discuss:

a) support service issues needed to serve a larger international student population

b) a review of Hazel's report and our Design for Diversity Plan

c) establishing relationships within the community, region, and public schools. Particular attention to those relationships that relate to the quality of the student experiences on the campus and those that encourage applications from individuals who may have concerns about the quality of the experiences at Platteville.

He concluded:

I believe you are perfectly positioned to address off-campus issues related to these areas. Our relationship with key state high schools, including our target high schools, is extremely important. Increasing the matriculation rate at Platteville from those schools must be a high priority.

I know this is a management style change, but I think it is what the institution needs and the division of student services is well positioned to handle the change. There are many strong managers within the division who can address the day-to-day operational issues and directions.

In a letter dated January 16, 1998, plaintiff responded to defendant Markee's letter. She addressed defendant Markee's concern about "establishing relationships" with the community, region and public schools. With respect to the community, plaintiff provided a list of various community programs in which she was involved. With respect to public schools, plaintiff wrote:

I believe that I am being directed to become the minority or rather African–American recruiter for the University. This is not a position which I have ever held, not a position for which I accepted employment at this institution, and not a role I am interested in assuming.

This request appears to blatantly overlook the obvious responsibility of the Dean of Admissions and Enrollment for establishing the very contacts which you describe.

In my more than twenty one consecutive years of employment at colleges and universities in five (5) different states, there have been few occasions when I have been asked or had to assume responsi-

bility for a task within the position description of one of my employees. Those occasions have included illness, vacancies caused by resignation or termination, or absence due to length of contract. I have never been asked to perform the work of a sitting employee hired and paid to perform a job.

Is this directive based on my ethnicity? If not, why has this assignment been given to me?

I look forward to finalizing my work plan for the semester and bringing closure to this matter.

Plaintiff and defendant Markee had a follow-up meeting on January 21. Defendant Markee told plaintiff that he had read her memo several times and thought about her ideas but his position was unchanged. He did not tell plaintiff that her January 16 memo reflected a misunderstanding about what he was asking her to do. After this meeting, defendant Markee sent her two memos suggesting that she participate in two events at Milwaukee area high schools.

In February 1998, defendant Markee told the university president that he had decided not to renew plaintiff's contract. On March 4, 1998, defendant Markee told plaintiff that he was not going to renew her contract when it expired in June 1999. He provided her with the following reasons: a) her lack of significant contribution to a new diversity plan; b) her staff suggestions, which indicated that she did not or would not accept input from others; c) her management style, which was one of maintenance of status quo, maximum control, self-protection and micromanagement—causing serious morale problems within her division; d) her refusal to cooperate with defendant Markee's reorganization plan; e) her refusal to cooperate with defendant Markee's enrollment management initiatives requiring community contacts and relationship building; and f) her

failure at managing difficult employees or resolving problems, requiring outside intervention. Defendant Markee offered to assist plaintiff in finding another position.

From November 1996 until March 1998, defendant Markee believed that plaintiff was becoming a more effective manager and contributing to his initiatives for the campus.

### D. Plaintiff's Relationships with Other Employees

Tony Sherwin was a minority recruiter at the university until 1996 or 1997. During his tenure, plaintiff learned that he had entered into an agreement on behalf of the university with an educational organization in Milwaukee. Plaintiff informed the organization that the university could not honor the agreement because only the chancellor and the provost had the authority to enter into the agreement proposed by Sherwin. Sherwin was not pleased with plaintiff. When plaintiff told defendant Markee about her decision, Markee supported her.

Although defendant Markee never met with Sherwin and does not recall the circumstances that led to Sherwin's departure, he believes that Sherwin was upset with plaintiff. In his exit questionnaire, Sherwin listed several reasons for leaving, including "non-supportive environment" and "racial harassment." In addition, he wrote that the university needed to "get rid of the good ol' boys club." He did not mention plaintiff.

At some point, Jim Mueller, the food services director and a white male, complained to defendant Markee about having to spend too much time responding to minor questions from plaintiff. Mueller had known defendant Markee when both worked at Northern Arizona University. Plaintiff had opposed Mueller's hiring because his references were weak. Under the reorganization in February 1997,

Mueller no longer reported to plaintiff. Plaintiff had few contacts with him after the reorganization.

Alfred Thompson was the director of multicultural student services and assistant to the chancellor for minority affairs. Plaintiff was one of Thompson's supervisors. In a letter dated March 24, 1997, Thompson told defendant Markee that he was taking a position with the University of Wisconsin—La Crosse. In addition, he wrote:

> I would like to thank Dr. Walker for her support over the past three years that I have served as the Director of Multi-Cultural Services and University Tutoring Services. I will miss the many positive interactions that we shared at University of Wisconsin–Platteville. Through her supervision, I have developed into a better administrator.

The personnel director for the university told defendant Markee when Thompson left in June 1997 that Thompson had complained about plaintiff in his exit questionnaire.

Elise Rogers replaced Thompson as the director of multicultural resources. Within two weeks of being hired, she complained to defendant Markee that plaintiff was "mistreating" her. Rogers resigned within 7 to 8 weeks of being hired.

Before Rogers resigned, plaintiff asked her to submit a draft proposal for a grant application. Rogers did not prepare a draft proposal or tell plaintiff that she was unable to do so. When plaintiff asked her about it, Rogers shouted at her. The conversation ended with Rogers's saying, "I want you to leave Dr. Walker! I want you out of here." Rogers continued to shout even after plaintiff went into her office and closed the door. When plaintiff told defendant Markee about the incident, Markee responded that Rogers was "manipulative" and had "gotten away with this kind of behavior for a long time."

### E. Recruitment Efforts of Other Administrators

Some of the deans at the university and defendant Markee himself participated in recruiting activity. As far as plaintiff is aware, white and male senior administrators such as Ralph Curtis (the vice chancellor and provost of the university), Steve Zielke (the assistant chancellor for business affairs), Patrick Hundley (the assistance chancellor for university advancement), Judy Paul and Michael Viney never visited any schools for recruiting purposes. (In her proposed findings of fact, plaintiff alleges that these administrators were not even *asked* to engage in recruiting activities, citing her affidavit as support. Plt.'s PFOF, dkt. # 35, at 43, ¶ 268. However, in her deposition, she testified that she believed they were asked, but they declined to participate. Dep. of Sharon Walker, *attached to* Aff. of Patricia Brady, Exh. A, dkt. # 21, at 42. Because plaintiff has not attempted to reconcile this discrepancy, I have considered only the testimony from her deposition, which defendants do not dispute. *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1297 (7th Cir.1993)). Richard Schumacher, a white male who is responsible for enrollment, made only a few visits to schools.

### F. Plaintiff's Statements

During a cabinet meeting in August 1996 attended by both plaintiff and defendant Markee, plaintiff raised a concern about a newsletter that the university had sent to the students. She stated that she believed the caricatures of racial minorities in the newsletter were offensive and inappropriate; she did not want any more newsletters with similar offensive material to be sent out until they were revised. Defendant Markee used the newsletter as an example of the type of newsletters that the university should be sending to the students. In a later meeting with pro-

gram directors in the division of student affairs, plaintiff expressed her concern about the newsletter again.

In a March 1997 meeting with the staff members of the admissions and enrollment management group, plaintiff discussed, among other things, her expectation that staff members would not engage in improper fraternizing with the students. A few weeks later, defendant Markee convened a meeting; the agenda included a discussion of dating relationships between faculty and students. After two administrators expressed support for fraternization, plaintiff noted that the University of Wisconsin had a policy that discouraged dating relationships between students and faculty. She stated that she could not support a more "lenient" or "relaxed" approach to fraternization. Defendant Markee did not direct the participants to review the university's policy and monitor its enforcement.

During the fall semester in 1997, Shelly Till, a university basketball coach, was attempting to negotiate accommodations in her schedule because of difficulties with her pregnancy. When Mark Molesworth, the athletic director, expressed reluctance to provide the accommodations, plaintiff reminded Molesworth that the athletic department had earlier made accommodations for another coach, John Dixon. Although Molesworth reported to plaintiff, defendant Markee assumed some supervision responsibilities for Molesworth after the February 1997 reorganization.

Till later raised more general issues with Molesworth such as the funding and staffing of men's sports programs as compared to the women's basketball program. Molesworth forwarded Till's comments to plaintiff, who told Molesworth that she was going to talk to defendant Markee.

Plaintiff spoke with defendant Markee about the situation in late October or early November 1997. She told Markee that Till "might be on the verge of filing some type of Title IX complaint." When plaintiff asked Markee if she could seek advice from the university's legal counsel, he told her that she could not.

Defendant Markee directed Molesworth to be the liaison to counsel for the university, but he told Molesworth to keep plaintiff informed. Plaintiff never complained to defendant Markee that she was not being informed.

In the fall of 1997 plaintiff learned that an investigation led to a determination that a food service manager had falsified time sheets for his son. Although the food services manager was an employee in plaintiff's division, she was not informed of the investigation or included in the subsequent decision to negotiate a retirement agreement with the manager. When plaintiff expressed her concerns to defendant Markee about being excluded from the decision making process, he expressed no surprise or concern. Plaintiff also asked Markee whether he was aware that the manager already had a reprimand in his personnel file relating to similar behavior.

### G. Events after Plaintiff's Departure

Defendant Markee replaced plaintiff with Mick Viney, a white male. The university now has a position in the department of admissions and enrollment with the title of "Recruiting Manager." The duties of this position include visiting schools.

## DISPUTED FACTS

The parties genuinely dispute the following facts: (a) whether defendant Markee laid out his expectations for plaintiff in a meeting during August 1996; (b) when, how often and with what level of specificity Markee told plaintiff he wanted her to be involved in recruiting; (c) whether Markee told plaintiff about complaints against her

during a November 1996 meeting; (d) whether plaintiff's replacement has been involved in visiting schools for recruiting purposes; (e) whether independent evaluators had to be brought in to evaluate one of plaintiff's employees, Sandra Stacy, because plaintiff had failed to do so adequately; (f) whether it was plaintiff or defendant Markee who had misgivings about hiring Elise Rogers; and (g) whether Mark Molesworth told Kevin Emerick, the assistant women's basketball coach, to exclude plaintiff from developments in the situation involving Shelly Till because plaintiff was a "black female."

## OPINION

### A. *Race and Sex Discrimination*

#### 1. *General principles*

Plaintiff brings her sex discrimination claim under the equal protection clause of the Fourteenth Amendment (via 42 U.S.C. § 1983) and Title VII of the Civil Rights of 1964. She brings her race discrimination claim under these laws as well as 42 U.S.C. § 1981. The Fourteenth Amendment prohibits states from denying any person the equal protection of the laws. Title VII prohibits employers from discriminating against employees or applicants on the basis of race, sex, religion or national origin. Section 1981 prohibits discrimination on the basis of race in the making and enforcing of contracts, including employment contracts. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). Each of these laws applies to discrimination by state employers. *Alexander v. Wisconsin Department of Health and Family Services,* 263 F.3d 673, 681–82 (7th Cir.2001).

Title VII is based on agency principles; § 1983 and § 1981 are predicated upon fault. *Compare Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) *with Hildebrandt v. Illinois Department of Natural Resources,* 347 F.3d 1014, 1039 (7th Cir. 2003). As plaintiff's former employer, the board of regents rather than defendant Markee is the proper defendant for plaintiff's Title VII claim. 42 U.S.C. § 2000e(b); *Mateu–Anderegg v. School District of Whitefish Bay,* 304 F.3d 618, 623 (7th Cir.2002). Because Congress has validly abrogated state sovereign immunity with respect to Title VII, plaintiff may recover damages against defendant Board of Regents on this claim. *Nanda v. Board of Trustees of the University of Illinois,* 303 F.3d 817, 830–31 (7th Cir.2002). However, plaintiffs may not sue state entities for damages under § 1981 or § 1983. *Williams v. Wisconsin,* 336 F.3d 576, 580 (7th Cir.2003) ("a state is not a 'person' subject to a damages action under § 1983"); *Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1184 (7th Cir. 1982) (holding that states are entitled to sovereign immunity for § 1981 claims). With respect to those two claims, plaintiff may seek damages from defendant Markee in his personal capacity if she can show that he was personally involved in the illegal decision. *Kelly v. Municipal Courts of Marion County, Indiana,* 97 F.3d 902, 908–09 (7th Cir.1996). In addition, she may obtain injunctive relief against Markee in his official capacity. *Power v. Summers,* 226 F.3d 815, 819 (7th Cir.2000) ("official capacity suits against state officials that seek only injunctive relief are permitted by 42 U.S.C. § 1983 and not forbidden by Eleventh Amendment") (citations omitted).

The standard for imposing liability on a defendant is essentially the same with respect to § 1981, § 1983 and Title VII. Under Title VII, a plaintiff establishes an unlawful employment practice when she demonstrates that her race or sex was a "motivating factor" in the employer's decision. 42 U.S.C. § 2000e–2(m); *see also Venters v. City of Delphi,* 123 F.3d 956,

973 n. 7 (7th Cir.1997). In other words, the plaintiff must prove that her race or sex was *one* of the reasons that the employer took adverse action against her. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). The plaintiff may use direct or circumstantial evidence to meet this burden. *Desert Palace v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). Similarly, the Supreme Court has held that a defendant may be held liable under § 1983 for violating the Fourteenth Amendment if discriminatory animus was a "motivating factor" in the decision. *Hunter v. Underwood,* 471 U.S. 222, 225, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 270, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *see also Williams v. Seniff,* 342 F.3d 774 (7th Cir.2003) ("Our cases make clear that the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection.") The Court of Appeals for the Seventh Circuit has held that discrimination claims brought under § 1981 should be analyzed under the same framework as claims under § 1983 and Title VII. *Patton v. Indianapolis Public School Board,* 276 F.3d 334, 338 (7th Cir.2002) ("Discrimination claims under both Title VII and § 1981 are analyzed in the same manner."); *Malacara v. City of Madison,* 224 F.3d 727, 729 (7th Cir.2000) (using same framework to analyze claims under § 1981, § 1983 and Title VII).

As the court of appeals has recognized, there is more than one way to prove a discrimination claim. A plaintiff may rely on decision makers' remarks or behavior that either acknowledge discriminatory intent or more ambiguously support an inference of discrimination. *Troupe v. May Department Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994). In addition, a plaintiff may show that similarly situated employees were given more favorable treatment. *Id.* Finally, a plaintiff may show that she was qualified for the job but replaced by someone outside her group and that the employer's stated reasons are unworthy of belief. *Id.* In cases decided after *Troupe,* the court of appeals has stated that the third method of proof is essentially the same as the burden shifting method first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Volovsek v. Wisconsin Dept. of Agriculture, Trade and Consumer Protection,* 344 F.3d 680, 690 (7th Cir. 2003); *Huff v. UARCO, Inc.,* 122 F.3d 374, 380 (7th Cir.1997); *see also Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (plaintiff may defeat motion for summary judgment if he shows that (a) he is member of protected class; (b) he was "otherwise qualified" for position; (c) he was terminated; (d) he was replaced by someone outside protected class; and (e) defendant's articulated reasons for firing him are not its true reasons).

### 2. *Adverse employment action*

Under any method of proof, a plaintiff must show that she suffered from what courts have referred to as an "adverse employment action." *See, e.g., Haywood v. Lucent Technologies, Inc.,* 323 F.3d 524, 531–32 (7th Cir.2003); *Schobert v. Illinois Dept. of Transportation,* 304 F.3d 725, 732 (7th Cir.2002); *Herrnreiter v. Chicago Housing Authority,* 315 F.3d 742, 744 (7th Cir.2002). Although this phrase is not found in § 1981, § 1983 or Title VII, each statute requires the plaintiff to prove an injury of some kind. Title VII requires a plaintiff to show that he was discriminated against "with respect to his compensation, terms, conditions, or privileges of employment" or that his employer treated him in a way that "would deprive or tend to de-

prive any individual of employment opportunities or otherwise adversely affect his status as an employee." 42 U.S.C. § 2000a. Section 1981 requires a plaintiff to show that her rights were impaired with respect to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Although the Fourteenth Amendment could be interpreted as extending to *all* differential treatment, the court of appeals has applied the "adverse employment action" limitation to claims under the equal protection clause as well. *E.g., McPhaul v. Board of Commissioners of Madison County,* 226 F.3d 558, 566 (7th Cir.2000); *see also Doe v. Welborn,* 110 F.3d 520, 523 (7th Cir.1997) ("Section 1983 is a tort statute, which means that the defendant must breach a duty owed to the plaintiff, who must suffer cognizable legal harm.")

Although there has been little discussion of the issue in the case law, it appears that the court of appeals assumes that the injury requirement is the same for each of the discrimination laws. *Hunt v. City of Markham,* 219 F.3d 649, 653–54 (7th Cir. 2000) (assuming that "adverse employment action" has same meaning in Title VII, ADEA and § 1981); *Dahm v. Flynn,* 60 F.3d 253 (7th Cir.1994) (relying on cases decided under Title VII in concluding that change in responsibility might constitute adverse employment action under § 1983); *cf. Halloway v. Milwaukee County,* 180 F.3d 820, 825–27 (7th Cir.1999) (applying same standard for "adverse employment action" under both § 1983 and ADEA).

█ In this case, the adverse action complained of by plaintiff is defendant Markee's decision to nonrenew her contract with the university. Defendants do not dispute that, generally, termination constitutes an adverse employment action. *See, e.g., Crady v. Liberty National Bank & Trust Co.,* 993 F.2d 132, 135 (7th Cir. 1993). Indeed, there are few employment actions that could be more "adverse" to an employee than being discharged. Nevertheless, defendants argue that nonrenewal of a contract is not the same thing as termination and should not be considered an adverse employment action. For support, they cite *Markel v. Board of Regents of the University of Wisconsin System,* 276 F.3d 906 (7th Cir.2002).

In *Markel,* the plaintiff was employed by the university on a fixed-term nine month contract. The defendant dismissed the plaintiff one month before her contract expired, but paid her in full up through the end of her contract, which was nonrenewable. The plaintiff contended that the university had discriminated against her because of her sex in violation of Title VII. In considering whether the plaintiff suffered from an adverse employment action, the court of appeals stated: "This is an interesting legal question because Markel was not technically dismissed from her job; she was paid in full until the end of her contract, and her contract was nonrenewable." *Id.* at 911. However, the court of appeals declined to decide the issue because it concluded that the plaintiff could not show that she was meeting her employer's legitimate expectations.

*Markel* is not helpful for defendants for at least two reasons. First, the court raised but did not resolve the question whether the plaintiff in that case suffered from an adverse employment action. Second, even if *Markel* could be read as implying that there was no adverse employment action in that case, *Markel* is readily distinguishable. In that case, the plaintiff's contract was *nonrenewable.* In this case, it is undisputed that defendants could have renewed plaintiff's contract if they had chosen to; defendant Markee's predecessor had done so three times. It is true that

defendants were under no *contractual* obligation to continue plaintiff's employment, but this is not a case involving an alleged breach of contract or a deprivation of a property interest. The question in this case is whether an employer may discriminate on the basis of race or sex in deciding whether to renew an employee's contract. In other words, if an employer would have renewed the contract of an African–American or female if she had been a white or male employee, does its failure to renew the African–American female's contract violate federal discrimination laws? Under defendants' view, employers would have impunity to discriminate on the basis of race or sex so long as they bided their time until the employee's contract expired. Nothing in *Markel* or the language of § 1981, § 1983 or Title VII requires such an absurd result.

Plaintiff's situation is little different from the countless other at-will employees who bring discrimination suits after they are terminated. Like plaintiff, at-will employees may be dismissed at any time and for almost any or no reason, so long as the reason is not a constitutionally or statutorily impermissible one. It is beyond dispute that at-will employees are entitled to the protections of Title VII and the equal protection clause. *See Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 805 (7th Cir.2001). The court of appeals has held recently that at-will employees may bring claims under § 1981 as well. *Walker v. Abbott Laboratories*, 340 F.3d 471 (7th Cir.2003). At the very least, plaintiff's situation is akin to an applicant who contends that she was not hired (or re-hired) because of her race or sex. The civil rights laws at issue in this case apply equally to both termination decisions and the refusal to re-hire. *See Cerutti v. BASF Corp.*, 349 F.3d 1055 (7th Cir.2003); *Johnson v. University of Wisconsin–Eau Claire*, 70 F.3d 469 (7th Cir.1995); *Von Zuckerstein v. Argonne National Labora-*

*tory*, 984 F.2d 1467 (7th Cir.1993). To the extent that defendants suggest that there is no adverse employment action when the employer's decision is a discretionary one, the court of appeals has squarely rejected this argument. *Power v. Summers*, 226 F.3d 815, 821 (7th Cir.2000) (denial of discretionary raise is adverse employment action).

Courts in other jurisdictions agree that the refusal to renew a contract is an adverse employment action. *Carter v. University of Toledo*, 349 F.3d 269 (6th Cir. 2003) (§ 1981 and Title VII); *Minshall v. McGraw Hill Broadcasting, Inc.*, 323 F.3d 1273, 1280 (10th Cir.2003) (ADEA); *Day v. South Park Independent School District*, 768 F.2d 696 (5th Cir.1985) (§ 1983); *Fekade v. Lincoln University*, 167 F.Supp.2d 731, 739 (E.D.Pa.2001) (Title VII); *Guinan v. Roman Catholic Archdiocese of Indianapolis*, 50 F.Supp.2d 845, 851 (S.D.Ind.1999) (ADEA); *Lindblom v. Challenger Day Program, Ltd.*, 37 F.Supp.2d 1109, 1116 (N.D.Ill.1999) (Title VII); *see also Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (assuming that termination after one-year contract is actionable under § 1981 and Title VII); *Trejo v. Shoben*, 319 F.3d 878 (7th Cir.2003) (assuming that refusal to renew contract was adverse employment action for purpose of First Amendment retaliation claim); *Griffin v. Board of Regents of Regency Universities*, 795 F.2d 1281 (7th Cir.1986) (assuming that refusal to renew contract was adverse employment action under Title VII).

Defendants declined to renew plaintiff's employment contract after six years. Whether this action is considered a termination or a refusal to re-hire, I conclude that it is a cognizable injury for the purpose of § 1981, § 1983 and Title VII. Being denied a renewed contract is not a "minor or trivial" action. *Silk v. City of*

*Chicago,* 194 F.3d 788, 800 (7th Cir.1999). If the reason defendants did not renew plaintiff's contract was her race or sex, they violated the law.

### 3. *Evidence of discrimination*

■ With respect to the first category of evidence identified in *Troupe* (behavior and conduct of the decision maker that would support an inference of discriminatory intent), plaintiff points to disputed testimony from Kevin Emerick, the former assistant women's basketball coach, that Mark Molesworth, the athletic director, told him that plaintiff should not be informed of developments in Shelly Till's complaint against the university because plaintiff was a "black female" and might be sympathetic to Till. Plt.'s PFOF, dkt. # 35, at 30–32, ¶¶ 188–97. An initial challenge for plaintiff is to show a link between Molesworth's alleged comments and the decision not to renew her contract. Plaintiff does not argue that Molesworth was involved in the decision. Therefore, before the remarks could be even arguably probative of discrimination, plaintiff would have to show that Molesworth's views somehow tainted defendant Markee's judgment. *Russell v. Board of Trustees of the University of Illinois,* 243 F.3d 336, 342 (7th Cir.2001); *see also Simmons v. Chicago Board of Education,* 289 F.3d 488, 492 (7th Cir.2002) ("statements by nondecisionmakers cannot satisfy a plaintiff's burden of proving discrimination").

Plaintiff relies on the following evidence to in an attempt to show that Molesworth's comments may be imputed to defendant Markee: (a) although plaintiff was Molesworth's immediate supervisor, Molesworth also reported to Markee; (b) according to Emerick, he and Molesworth were reporting directly to Markee on the Till situation, bypassing plaintiff; (c) Markee never disclaimed Molesworth's alleged statements, even after he learned of Emerick's accusation; (d) when plaintiff asked Markee if she could discuss the Till situation with the university's legal counsel, Markee told her she could not.

As discussed below in the context of plaintiff's retaliation claim, this evidence could support an inference that defendant Markee did not want plaintiff to be involved in the Till situation. However, it does not support an inference that Markee discriminated against plaintiff because of her race or sex. Plaintiff points to nothing in the record demonstrating that defendant Markee directed Molesworth to make the alleged comments or that he shared the view expressed in these comments. In addition, plaintiff fails to explain why discriminatory intent is suggested by silence about *someone else's* statements. A plaintiff in a discrimination case cannot create a triable issue through speculation alone. *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir.2003). Therefore, I cannot conclude that Molesworth's alleged comments support plaintiff's case.

With respect to the third category of evidence identified in *Troupe,* plaintiff has shown that she was replaced by a white male and that she was "qualified" for the position, at least to the extent that she had the necessary skills and experience to be an assistant chancellor. In addition, defendants agree that plaintiff achieved a number of significant accomplishments during her tenure as assistant chancellor. To the extent that being "qualified" within the meaning of *Troupe* means meeting the employer's legitimate expectations, this issue merges with the question of pretext and the two may be analyzed together. *Jones v. Union Pacific Railroad Co.,* 302 F.3d 735, 742 (7th Cir.2002). Thus, the question is whether plaintiff has adduced evidence that defendants' stated reason for dismissing her are unworthy of belief. (Plaintiff has also adduced the second kind of evidence identified in *Troupe,* namely,

evidence that similarly situated administrators received more favorable treatment. Because this evidence is relevant to the question of pretext, I will reserve discussion of it for the pretext analysis to avoid duplication.)

In their brief, defendants advance two reasons for the decision not to renew plaintiff's contract: (1) she refused defendant Markee's directives regarding reorganization and recruiting; and (2) her management style was having an adverse effect on staff morale to the point that staff members were resigning. Dfts.' Br., dkt. # 17, at 12. Defendants also propose findings of fact related to other alleged deficiencies in plaintiff's performance, although they are not necessarily the same problems cited during the March 1998 meeting. I have not considered these facts because defendants do not argue that defendant Markee relied on any of these alleged deficiencies in making his decision. *See Balderston v. Fairbanks Morse Engine Division of Coltec Industries,* 328 F.3d 309, 323 (7th Cir. 2003) (refusing to consider alleged deficiencies of plaintiff when there was no evidence that those deficiencies influenced decision maker ).

■ Plaintiff also notes in her brief that the reasons cited in defendants' brief are not the only reasons that defendant Markee provided during the personnel commission hearing or when he first informed her that he was not renewing her contract. She observes that among Markee's initial reasons was plaintiff's "failure to assess and promptly address serious functioning of the placement office, which was under her supervision." Plaintiff devotes a significant portion of her brief (15 pages) to explaining why there is no basis in fact for defendant Markee's asserted belief that she was having difficulty managing the placement office. Her emphasis is somewhat puzzling considering that defendants are not relying on this reason for the purpose of summary judgment.

■ It may be that plaintiff means to argue that defendants' decision not to emphasize some of their initial reasons shows that all of their reasons are pretextual. It is true that an employer's shifting explanations may support a finding of pretext. *Zaccagnini v. Chas. Levy Circulating Co.,* 338 F.3d 672, 678 (7th Cir.2003). Generally, however, this is true only when the employer is attempting to advance new reasons during litigation that were not offered before. *See, e.g., O'Neal v. City of New Albany,* 293 F.3d 998, 1005–06 (7th Cir.2002); *Stalter v. Wal–Mart Stores, Inc.,* 195 F.3d 285, 291 (7th Cir.1999); *Emmel v. Coca–Cola Bottling Co.,* 95 F.3d 627, 634 (7th Cir.1996). Also, a jury may infer pretext from a an employer's disavowal of a reason it gave previously. *Appelbaum v. Milwaukee Metropolitan Sewerage District,* 340 F.3d 573, 579 (7th Cir. 2003). In this case, however, defendants have not advanced new reasons or even rejected their earlier ones, at least not expressly. It is not necessarily inconsistent to focus in litigation on a subset of the reasons originally given. *Schuster v. Lucent Technologies,* 327 F.3d 569, 577 (7th Cir.2003) ("[T]he explanations must actually be shifting and inconsistent to permit an inference of mendacity.")

■ Therefore, assuming that plaintiff has demonstrated that it is pretextual for defendants to assert that she had difficulty managing the placement office, it would not necessarily help plaintiff because the court of appeals has held that a plaintiff must show independently that *all* of the defendant's articulated reasons are pretextual. *Olsen v. Marshall & Ilsley Corp.,* 267 F.3d 597, 601 (7th Cir.2001); *Crim v. Board of Education of Cairo School District,* 147 F.3d 535, 541 (7th Cir.1998). There is a limited exception to this rule

when all of the reasons are intertwined or the pretextual character of one reason is so "fishy and suspicious" that it calls into doubt each of the reasons. *Russell v. Acme–Evans Co.,* 51 F.3d 64, 70 (7th Cir. 1995). I need not consider whether this exception might apply in this case because I conclude that plaintiff has adduced sufficient evidence to allow a jury to find that the non-discriminatory reasons asserted in defendants' brief are pretextual.

Perhaps the reason relied on most heavily by defendants is plaintiff's resistance to defendant Markee's directive to engage in recruiting efforts. Plaintiff attempts to cast doubt on this reason in many ways, arguing that recruiting was not part of her job description, that Markee was not clear regarding what he wanted her to do and that she did not in fact defy defendant Markee's orders.

■ The first argument is a nonstarter. Nothing in Title VII, § 1981 or the Fourteenth Amendment prohibits employers from changing job descriptions or reassigning tasks. As noted above, defendant Markee was entitled to act unreasonably or unfairly. Plaintiff's second and third argument have some support in the record. It is undisputed that defendant Markee told plaintiff on at least one occasion that he was "not sure" what he wanted her to do with recruitment. In addition, it appears that plaintiff never refused outright to become involved in recruiting activities. Again, however, an employer does not violate discrimination laws if it gives vague directives or terminates only difficult or resistant employees rather than ones who are blatantly defiant. Plaintiff points to no evidence showing that she even attempted to comply with Markee's instructions. Although the parties disagree about the number of times that defendant Markee told plaintiff he wanted her to engage in recruiting activities, it is undisputed that plaintiff told Markee during their December 1997 meeting that she was not interested in being a recruiter, whatever that might entail. Plaintiff cannot show that there was no basis in fact for Markee's perception of insubordination. *Hall v. Gary Community School Corporation,* 298 F.3d 672 (7th Cir.2002) (evidence that defendant had "exaggerated" plaintiff's deficiencies did support inference of pretext); *Simmons v. Chicago Board of Education,* 289 F.3d 488 (7th Cir.2002) (when one of defendant's articulated reasons for termination was plaintiff's insubordination, plaintiff could not show pretext with evidence that he "never explicitly stated that he would not comply with [his supervisor's] directive").

■ However, even if defendant Markee had a legitimate reason for being frustrated with plaintiff, she may establish an issue of fact regarding pretext if he treated similarly situated administrators more favorably. *Appelbaum,* 340 F.3d at 580 ("Disparate discipline of an employee who is similarly situated to the plaintiff but is outside the protected class may support an inference of ... discrimination."); *Curry v. Menard, Inc.,* 270 F.3d 473, 479 (7th Cir.2001). Plaintiff suggests that to the extent she was resistant to defendant Markee's directive, it was because she believed that he was targeting her because of her race to become a minority recruiter. Plaintiff does not specify why she suspected this, although presumably it was because of Markee's emphasis on "nontraditional" students. Further, she argues that Markee confirmed her suspicion when he did not respond to her question, "Is this directive based on my ethnicity?" Defendant Markee denies that he failed to respond to her question, but of course, on a motion for summary judgment, I must view the evidence in the light most favorable to plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986). This dispute alone would not necessarily carry the day for plaintiff by itself, but she has also adduced evidence that white and male senior administrators declined to engage in recruiting and did so without consequence.

If these other administrators were not similarly situated to plaintiff, their differential treatment would not be probative, *O'Regan v. Arbitration Forums, Inc.,* 246 F.3d 975, 985 (7th Cir.2001), but defendants have not identified any relevant differences. *Curry,* 270 F.3d at 479 (on motion for summary judgment, employer has initial burden to present evidence that employees are not similarly situated). Like the other senior administrators, plaintiff's primary responsibilities were not related to recruiting. Although defendant Markee was free to assign duties to plaintiff that were outside her job description, if his expectations of her were different from his expectations for other senior administrations, this would support an inference of pretext. *Cf. Hedrich v. Board of Regents of University of Wisconsin System,* 274 F.3d 1174, 1183 (7th Cir.2001) (no inference of discrimination when defendant applied criteria outside handbook to plaintiff because there was no evidence that others' assessments were limited to criteria in handbook).

Defendant Markee did tell plaintiff that he believed she was "perfectly positioned to address off-campus issues," but he never explained *why* he held this belief. Further, to the extent that there was something unique about the office of student affairs, plaintiff has adduced evidence that her replacement as assistant chancellor of student affairs has engaged in almost no recruiting since he was hired. In fact, since plaintiff's departure, the university has hired a "recruiting manager," who is responsible for visiting schools. This evidence is sufficient to create a genuine dispute whether plaintiff's lack of recruiting efforts actually motivated defendant Markee's decision to nonrenew her contract. *Freeman v. Madison Metropolitan School District,* 231 F.3d 374, 379 (7th Cir.2000) (evidence that perceived deficiency did not actually motivate decision is evidence of pretext).

■ A second reason articulated by defendants was plaintiff's resistance to defendant Markee's reorganization efforts. The problem with this reason is that there is no evidence that plaintiff *was* resistant to defendant Markee's divisional reorganization. The only incident defendants point to is that plaintiff raised some concerns about Markee's plan before it was implemented. Neither side proposes any facts about what those concerns were, but it is undisputed that Markee *accepted and implemented* her suggestions. Although defendants propose as a fact that defendant Markee "believed" that too many people were reporting to plaintiff, the facts show that under Markee's plan, the number of employees reporting to plaintiff *increased.* Although Markee may have expected plaintiff to reduce the number of persons reporting to her after the reorganization, defendants point to no evidence that Markee ever communicated this expectation to plaintiff. Further, Markee did not question plaintiff during her 1997 evaluation when she listed "divisional reorganization" as one of her most significant accomplishments. Because there is no evidence that plaintiff resisted Markee's reorganization efforts or that Markee found fault with plaintiff's concerns at the time, defendants have failed to meet their burden of production with respect to this reason. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (defendant must "produc[e] *evidence* that the plaintiff was rejected, or someone else was preferred, for

a legitimate, nondiscriminatory reason") (emphasis added).

Third, defendants assert that plaintiff's management style created morale problems within the student affairs office. Defendants cite several employees who they say left the university in part because of plaintiff. First, they point to Tony Sherwin, who was a minority recruiter for the university until 1996 or 1997. Although defendant Markee avers that he believes Sherwin was upset with plaintiff when he left, he is unable to articulate why he believes this. Markee concedes that he never met with Sherwin and he does not remember the circumstances surrounding his departure. As reasons for leaving the university, Sherwin cited "racial harassment" and "the good ol' boys club" in his exit questionnaire. He did not mention plaintiff. There is only one example in the record of an instance when defendant Markee knew that Sherwin was displeased with plaintiff: when plaintiff reprimanded Sherwin for entering into an agreement for which he had no authority. However, it is undisputed that defendant Markee supported plaintiff's decision when she told him what happened.

The circumstances surrounding Elise Rogers's departure are similar. Although the facts show that Rogers was upset with plaintiff when she left after less than two months of employment, the facts show also that defendant Markee did not blame plaintiff for Rogers's dissatisfaction at the time. Rather, when plaintiff went to Markee about the situation with Rogers, he responded that Rogers was "manipulative" and had "gotten away with this kind of behavior for a long time." This is sufficient to show that Rogers's complaints about plaintiff may not have been the real reason for plaintiff's termination. *Grayson*, 308 F.3d at 820.

The closest call may be with respect to Alfred Thompson, who was the director of multicultural student services until June 1997. Defendants propose many findings of fact regarding problems that Thompson had with plaintiff. Plaintiff disputes the reasonableness of Thompson's complaints, but her belief alone would not be sufficient to show pretext. *Chiaramonte v. Fashion Bed Group*, 129 F.3d 391, 401 (7th Cir. 1997). In addition, plaintiff alleges *in her brief* that Thompson had complained about another senior administrator who was never disciplined. Plt.'s Br., dkt. # 34, at 7. Plaintiff did not include this allegation in her proposed findings of fact and she provides no citation to the record in her brief. Therefore, even assuming these complaints are comparable to plaintiff's, I cannot consider them. Briefs are not evidence. Fed. R.Civ.P. 56(c); *Procedure to Be Followed on Motions for Summary Judgment*, I.B.4 ("The court will not consider facts contained only in a brief.")

The problem with relying on Thompson's complaints, however, is that there is no evidence that Thompson ever presented them to defendant Markee. Rather, in Thompson's letter to Markee announcing his decision to leave, he wrote that he wanted to "thank Dr. Walker for her support over the past three years ... I will miss the many positive interactions that we shared." The facts do show that the personnel director told Markee that Thompson had complained about plaintiff in his exit questionnaire. However, a reasonable jury could find that Thompson's complaint did not motivate the decision to terminate plaintiff because Markee took no action against plaintiff at the time that Thompson completed the questionnaire. Rather, Markee waited six months to mention Thompson's complaint to plaintiff. *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520 (7th Cir.2003) (defendant's failure to take action on complaints supports finding of pretext). (In addition to these specific complaints, defendants also

propose as a fact that the university president told defendant Markee about complaints against plaintiff. Because defendants concede that Markee did not see any merit to these complaints, Dfts.' Reply to Plt.'s Resp. to Dfts.' PFOF, dkt. # 44, at 14, ¶ 12, I have not considered this fact.).

With respect to plaintiff's performance in general, I agree with defendants that there is limited probative value to plaintiff's evidence that defendant Markee's predecessor was extremely satisfied with her work. Such evidence might be marginally relevant to show that Markee's expectations were non-legitimate and discriminatory. *Fortier v. Ameritech Mobile Communications,* 161 F.3d 1106, 1113 (7th Cir.1998). However, as defendants point out, the court of appeals has stated many times that it is not the employee's past performance that matters but her performance at the time of the adverse decision. *Staples v. Pepsi–Cola General Bottlers, Inc.,* 312 F.3d 294, 300 (7th Cir.2002); *Peele v. Country Mutual Insurance,* 288 F.3d 319, 329 (7th Cir.2002). Similarly, it helps plaintiff's case little to show that the North Central Accrediting Association gave her office a positive review. Defendant Markee was free to disagree with another's assessment of plaintiff's performance. Even if a third party's positive assessment could be relevant to showing pretext, plaintiff has adduced no evidence that the association considered the factors that were important to Markee.

Nevertheless, plaintiff has undermined defendants' assertion that her overall performance was the reason for the nonrenewal of her contract by adducing evidence that defendant Markee did not indicate *any* displeasure with plaintiff's performance until just before he made his decision. It is undisputed that Markee told plaintiff during their 1997 evaluation conference that the year had gone well and that he did not suggest any areas where she needed improvement. It is also undisputed that, later in 1997, Markee gave plaintiff a merit-based raise that was comparable to the raises received by other assistant chancellors and that until at least March 1998, Markee believed that plaintiff was becoming a more effective manager and contributing to his initiatives for campus. Further, there is a genuine dispute with respect to whether defendant Markee expressed concerns about plaintiff's performance before December 1997.

■■■ Finally, in one paragraph in their brief-in-chief, defendants argue that courts must give "enhanced deference" to employers in the university context and that this deference "militates against a finding of pretext." In support of this argument, defendants cite *Hishon v. King & Spalding,* 467 U.S. 69, 80 n. 4, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (Powell, J., concurring), in which Justice Powell observed: "[T]he Courts of Appeals generally have acknowledged that respect for academic freedom requires some deference to the judgment of schools and universities as to the qualifications of professors, particularly those considered for tenured positions."

It is not clear how defendants believe Justice Powell's footnote in *Hishon* should apply to this case. Certainly, defendants cannot intend to argue that academic freedom gives universities carte blanche to discriminate against African–Americans or women. The Supreme Court has never embraced this view. At most, the Court has suggested that academic freedom could be a relevant consideration in evaluating affirmative action plans. *Grutter v. Bollinger,* 539 U.S. 306, ——, 123 S.Ct. 2325, 2336, 156 L.Ed.2d 304 (2003). Defendants do not suggest that they terminated plaintiff as part of a plan to increase diversity on campus. To the extent that defendants mean to argue that courts must give greater weight to defendant Markee's

testimony because he represents a university, this would greatly exceed a court's authority in deciding summary judgment motions. *Appelbaum*, 340 F.3d at 579 (on motion for summary judgment, courts must "resis[t] temptation to weigh the evidence or to make our own credibility determinations").

■ The Court's observation in *Hishon* is little more than a truism that could be said about *any* employer, not just universities. In evaluating any discrimination case, a court must give deference to the employer's judgment. The court of appeals has stated countless times that courts may not act as a "super personnel" department. *E.g., Dyrek v. Garvey*, 334 F.3d 590, 598 (7th Cir.2003); *Balderston*, 328 F.3d at 324; *Grayson*, 308 F.3d at 820. This is why a plaintiff must do more than show the unreasonableness of an employer's decision; she must show that its reasons are dishonest. However, nothing in *Hishon* puts a heavier burden on employees of universities in meeting this burden. Defendants cite no other authority that would require this result and I decline to impose one in this case.

### 4. Summary

Plaintiff's case of discrimination is far from overwhelming. There is little, if any, indication in the record that defendant Markee harbored any animus against African–Americans or women. Further, much of the evidence relied upon by plaintiff is unhelpful either because it challenges the reasonableness of Markee's decision, relates to the intent of individuals who played no part in the decision or relates to other administrators' deficiencies that were not comparable to the problems that Markee perceived in plaintiff's performance. (For instance, it does not help plaintiff's case to show that Markee failed to discipline administrators who were insubordinate to *her*. A chancellor will likely

be much more concerned with insuring that his own directives are followed than with enforcing policies of other administrators. *Haywood v. Lucent Technologies*, 323 F.3d 524 (7th Cir.2003) (evidence of differential treatment not probative when offenses of employees were not the same).)

Despite these deficiencies, plaintiff has done the minimum necessary to bring her case before a jury. Plaintiff was replaced by a white male and she has adduced evidence that she was meeting defendant Markee's legitimate expectations, that she was treated differently from similarly situated white and male administrators and that defendants' articulated reasons for refusing to renew her contract are not honest. Generally, this is sufficient to show a genuine issue of material fact whether the defendant discriminated against an employee in violation of Title VII, § 1981 or § 1983. *Zaccagnini*, 338 F.3d at 676 (" 'Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes summary judgment.' ") (quoting *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir.1995); *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1046 (7th Cir.1999)). Defendants' motion for summary judgment will be denied with respect to plaintiff's claims that she was discriminated against because of her race and sex.

### B. Retaliation

#### 1. Public concern

The First Amendment provides public employees with limited protection when their employer retaliates against them for engaging in expressive conduct. The threshold question for a retaliation claim under the First Amendment is whether the employee engaged in protected speech. *Patton v. Indianapolis Public School Board*, 276 F.3d 334, 340 (7th Cir.2002). In the public employment context, this in-

quiry requires a determination whether the employee engaged in speech that is a matter of public concern. *Trejo*, 319 F.3d at 884. In other words, the employee must show that she addressed "a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir.2002); *see also Dishnow v. School District of Rib Lake*, 77 F.3d 194, 197 (7th Cir.1996)(matter of public concern is one "in which the public might be interested, as distinct from wholly personal grievances").

Although one could argue that a jury (members of the "public") would be the body most capable of determining whether a statement is a matter of public concern, the court of appeals has held that the question whether speech is constitutionally protected is a question of law to be decided by the court, *see Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir.2000); *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir.1999), using the *Connick–Pickering* test. *See Connick*, 461 U.S. 138, 103 S.Ct. 1684; *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In making this determination, a court must consider the content, form and context of the speech, *Gustafson*, 290 F.3d at 906–07. Content is the most important factor, *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 974 (7th Cir.2000), "though '[t]he speaker's motivation and choice of forum are [also] important because, absent those factors, every employment dispute involving a public agency could be considered a matter of public concern.'" *Wright v. Illinois Department of Children and Family Services*, 40 F.3d 1492, 1501 (7th Cir.1994).

Five statements made by plaintiff are at issue: (1) her complaint during a meeting about cartoon caricatures that she found to be racially offensive; (2) her discussions with Molesworth and defendant Markee regarding pregnancy accommodations for Shelly Till and a potential sex discrimination complaint by Till; (3) her expressed opinion regarding relationships between students and faculty and the university's policy on this issue; (4) her questioning of Markee about the investigation of the food services manager who had falsified time sheets; and (5) the concerns she raised with Markee about his reorganization plan.

■■■ With respect to plaintiff's first two statements, it is beyond dispute that race and sex discrimination are matters of public concern. *Connick*, 461 U.S. at 148, 103 S.Ct. 1684 (race discrimination); *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999) (sex discrimination). Plaintiff's statements about the cartoon caricatures could be viewed as more of a concern about insensitivity than discrimination, but I do not find this an important difference. Plaintiff was objecting to the depiction of racial minorities in a newsletter that had been sent to the students at the university. This is sufficient to show that she was speaking on a matter of public concern. *Jeffries v. Harleston*, 21 F.3d 1238, 1245 (2d Cir.1994) (speech objecting to representations of African–Americans in curriculum "unquestionably involved public issues"), *vacated on other grounds by Harleston v. Jeffries*, 513 U.S. 996, 115 S.Ct. 502, 130 L.Ed.2d 411 (1994); *see also Gumbhir v. Curators of the University of Missouri*, 157 F.3d 1141, 1144 (8th Cir. 1998) (complaints about ethnic slurs and "unfavorable comments concerning immigrants" were matters of public concern).

■■■ I reach the same conclusion regarding plaintiff's comments on the Till incident. Although plaintiff was not complaining about gender inequity as Till was, the facts show that plaintiff's statements were made in the context of trying to insure that the university's actions were in compliance with laws against sex discrimi-

nation. They were not complaints about her own grievances or "casual chit-chat." *Swank v. Smart,* 898 F.2d 1247, 1251 (7th Cir.1990). Speech about compliance with the law is a matter of public concern. *E.g., Southside Public Schools v. Hill,* 827 F.2d 270 (8th Cir.1987) (compliance with federally-mandated programs for the disabled); *see also Hensley v. Horne,* 297 F.3d 344, 347 (4th Cir.2002) (inquiries into sexual harassment complaint of another employee).

■ The comments about dating relationships are a closer call. Some of plaintiff's comments appear to be no more than a statement of her own standard of conduct, which would not be protected by the First Amendment. However, "[s]peech [may have] multiple objectives. One statement can address issues of both public and private concern." *Wales v. Board of Education of Community Unit School District 300,* 120 F.3d 82, 84–85 (7th Cir.1997). The facts suggest that plaintiff's primary concern was insuring compliance with the university's policy, which would be a matter of public concern. *E.g., Johnson v. University of Cincinnati,* 215 F.3d 561 (6th Cir.2000) (compliance with affirmative action program). Accordingly, I conclude that these statements are protected by the First Amendment.

Defendants do not argue that their interest in "promoting effective and efficient public service" outweighed plaintiff's right to comment on the above three issues. *Gustafson,* 290 F.3d at 909. Therefore, I need not engage in weighing the various factors set forth by the Supreme Court in *Pickering.*

■ With respect to the final two issues, I cannot conclude that plaintiff's comments about defendant Markee's reorganization plan are protected speech because plaintiff has adduced no evidence about those comments. In her brief, plaintiff argues that she had concerns that the reorganization plan could result "in a setback for diversity in the Division of Student Affairs, because [the] plan initially had no direct reports to Dr. Walker by women or minority directors." Plt.'s Br., dkt. # 34, at 39. Plaintiff's brief contains no citation to the record and she proposes no findings of fact that support the allegation in her brief. Rather, in her proposed findings of fact, she states only that she made "recommendations" to defendant Markee about the reorganization plan and that he accepted them. Plt.'s PFOF, dkt. # 35, at 9, ¶ 63. Because plaintiff has pointed to no evidence showing that she communicated her concern to defendant Markee, I cannot conclude that her statements support a claim for retaliation under the First Amendment. *Michael v. St. Joseph County,* 259 F.3d 842, 846 (7th Cir. 2001) (rejecting retaliation claim because "there is no evidence in the record definitively establishing" what plaintiff said to defendant); *Hartman v. Board of Trustees of Community College District No. 508, Cook County, Illinois,* 4 F.3d 465, 471 (7th Cir.1993).

■ Finally, plaintiff has failed to show that the First Amendment would protect her conversation with defendant Markee about the investigation of the food service manager. Plaintiff is correct that complaints of "general wrongdoing" may be a matter of public concern, *Marshall v. Porter County Plan Commission,* 32 F.3d 1215 (7th Cir.1994), but the available evidence shows that plaintiff was objecting to her exclusion from the investigation process, not to the manager's wrongdoing or to Markee's alleged lax acceptance of it. Because plaintiff's grievance was primarily personal in nature, plaintiff's retaliation claim cannot survive with respect to this statement. *Wallscetti v. Fox,* 258 F.3d 662, 667 (7th Cir.2001) ("speech relating to only the effect an employer's action has on

the speaker is not shielded by the First Amendment"); *Colburn v. Trustees of Indiana University*, 973 F.2d 581, 587 (no First Amendment protection when "overriding reason for speech" was personal in nature); *see also Jackson v. Leighton*, 168 F.3d 903 (6th Cir.1999) (criticism of preferential treatment to one employee not matter of public concern). Accordingly, I will grant defendants' motion for summary judgment with respect to these two statements.

## 2. *Causation*

 As with claims under the Fourteenth Amendment, a plaintiff may prove retaliation under the First Amendment if she shows that her protected speech was a "substantial or motivating" factor in the defendants' action against her. *Morfin*, 349 F.3d at 1005. In support of this element, plaintiff points to the undisputed facts that defendant Markee was aware of each of plaintiff's protected statements (he was one to which each was directed) and that Markee began to consider not renewing plaintiff's contract within weeks of their discussion about Till. In addition, plaintiff relies again on (a) Emerick's testimony that he and Molesworth were bypassing her and reporting directly to Markee on developments in Till's case and that Molesworth told Emerick that plaintiff should be excluded because she was a "black female" and (b) Markee's refusal to allow plaintiff to speak with legal counsel about Till's potential discrimination complaint.

 Closeness in time between protected speech and an adverse decision can be evidence that the speech played a role in the decision. *Sitar v. Indiana Department of Transportation*, 344 F.3d 720, 728 (7th Cir.2003); *McGuire v. City of Springfield, Illinois*, 280 F.3d 794, 796 (7th Cir. 2002). However, the court of appeals has not made it entirely clear whether temporal proximity may be sufficient on its own to show that a plaintiff's protected conduct motivated an employer's decision. For instance, in *Stone v. City of Indianapolis Public Utilities*, 281 F.3d 640, 644 (7th Cir.2002), the court stated that temporal proximity "will rarely be sufficient in and of itself to create a triable issue." But in *Lalvani v. Cook County, Illinois*, 269 F.3d 785, 790 (7th Cir.2001), the court stated, "When an adverse employment action follows close on the heels of protected expression, and the plaintiff can show that the person who decided to impose the adverse action knew of the protected conduct, the causation element of the prima facie case is typically satisfied."

Perhaps *Stone* and *Lalvani* are not as inconsistent as they might seem at first blush. The lesson of both cases may be that timing should not be viewed in isolation; it can be more or less probative depending on the facts of each case. For example, in this case, the probative value of the timing is enhanced if I credit plaintiff's testimony (which I must do) that defendant Markee had given her no indication before she raised these concerns that he and she "weren't getting along" or that she was otherwise not meeting his expectations. Even assuming that Markee had spoken with plaintiff before December 1997 about problems, defendants point to no incidents occurring around this time that would have led him to think about not renewing plaintiff's contract. *See Pugh v. City of Attica, Indiana*, 259 F.3d 619, 630 (7th Cir.2001) (temporal proximity insufficient when record "establish[ed] that the City discharged Mr. Pugh for misappropriation of funds"); *Thomsen v. Romeis*, 198 F.3d 1022, 1028 (7th Cir.2000) (closeness in time not suspicious when other evidence established legitimate reason for termination). Combined with defendant Markee's reluctance to allow plaintiff to be involved in the investigation even though

plaintiff was the supervisor for the athletic department, this evidence would permit a jury to reasonably infer that plaintiff's protected speech motivated Markee's decision not to renew plaintiff's contract.

 All of the above evidence relates only to plaintiff's speech about Till; her speech on the dating policy and the cartoon caricatures occurred more than six months before the target date. Generally, a period this long would not be sufficient to support an inference of retaliation. *Wallscetti v. Fox*, 258 F.3d 662, 669 (7th Cir.2001) (by itself, time lapse of four months too long to support inference of retaliation).

Citing a case from the Third Circuit, plaintiff argues that her earlier statements can piggyback on those related to the Till incident because a reasonable jury could infer that defendant Markee had been irked by each of her protected comments but that the latest one was the last straw. *San Filippo v. Bongiovanni*, 30 F.3d 424, 444 (3d Cir.1994) ("[W]here, as here, a plaintiff engages in subsequent protected activity and the plaintiff is dismissed shortly after the final episode of protected activity, a fact finder may reasonably infer that it was the aggregate of the protected activities that led to retaliatory dismissal.") The rationale of *San Filippo* would be strongest when all of the plaintiff's protected speech related to the same subject matter. In this case, however, plaintiff's statements were unrelated; their only unifying point is that each is on a matter of public concern. Accepting plaintiff's argument in full would mean that employees could create a triable issue with respect to any protected statement, no matter how old or tenuous the connection between the speech and the adverse decision. Particularly because there is little evidence that defendant Markee exhibited any hostility to plaintiff's other statements, I cannot conclude that it would be reasonable for a jury to find that Markee relied on the statements in making his decision. Accordingly, I will grant defendants' motion for summary judgment on plaintiff's retaliation claims, with the exception of plaintiff's claim that defendant Markee refused not to renew her contract because of her speech related to the Till incident.

I note that in the context of retaliation cases brought under Title VII, the court of appeals has held that a plaintiff does not need to prove a causal connection in order to survive a motion for summary judgment. *Stone*, 281 F.3d at 644; *see also Sitar*, 344 F.3d at 728; *Rogers v. City of Chicago*, 320 F.3d 748, 755 (7th Cir.2003). Rather, the finder of fact may infer causation if the plaintiff can establish a prima facie case similar to the one in *McDonnell Douglas*. The court of appeals has not yet applied this framework in the context of First Amendment retaliation claims and plaintiff has not argued that she could satisfy it if the framework did apply. Therefore, she has waived any argument that she could prove her retaliation claims under an indirect approach.

### 3. *Adverse employment action*

 I note briefly that the injury requirement in a First Amendment retaliation case is different from the requirement in a retaliation or discrimination case under Title VII. The Court of Appeals for the Seventh Circuit has held that a plaintiff need not point to an "adverse employment action" in a retaliation case under the First Amendment; it is sufficient if she shows that the defendant's action "is likely to deter the exercise of free speech, whether by an employee or anyone else." *Power*, 226 F.3d at 820. An actionable injury includes "even something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday." *Id.* I have

no difficulty in concluding that this test is satisfied by a refusal to renew a contract that an employee hoped and expected would be renewed.

4. *Affirmative defense*

■ An employer may avoid liability for retaliation under the First Amendment if it can prove by a preponderance of the evidence that it would have taken the same action even if the plaintiff had not engaged in protected speech. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). However, because I have concluded that plaintiff has adduced sufficient evidence to allow a reasonable jury to find that defendant Markee's reasons for not renewing plaintiff's contract are pretextual, defendants cannot succeed on this defense as a matter of law.

## C. *Qualified Immunity*

Defendants argue that even if plaintiff has demonstrated that there is a genuine issue of material fact on her claims under §§ 1981 and 1983, defendant Markee is nonetheless entitled to qualified immunity, which bars money damages against a public official when his conduct did not violate "clearly established" constitutional rights. *See Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

At the outset, I note that defendants' argument on this issue is not entirely clear. In their brief in chief, defendants write: "Chancellor Markee would be entitled to qualified immunity because it was not clearly unconstitutional for a reasonable official to not renew the limited term contract of an 'at will' employee who was overtly resisting the changes he was lawfully imposing on upper management, and thereby sabotaging his ability to comply with his mandate from the Board of Regents to increase enrollment." Dfts.' Br., dkt. # 17, at 28.

Two possible arguments may be gleaned from this sentence. The first is that defendant Markee is entitled to qualified immunity because he terminated plaintiff for legitimate reasons, an act that is not clearly unconstitutional. The obvious deficiency in this argument is that it confuses the question of what is unconstitutional with the question of what is clearly established. Of course, defendant Markee would not violate the Constitution if he chose not to renew plaintiff's contract because of insubordination and not because of her race or sex. However, I have concluded that there is a genuine issue of material fact about defendant Markee's reasons for terminating plaintiff. If the real reason was her race or sex or the exercise of her First Amendment rights, Markee could not deny that such a decision would violate the Constitution and that its unlawfulness would be clearly established. *Gustafson v. Jones,* 290 F.3d 895 (7th Cir.2002) ("[T]he key elements of this case have been clear for years: a public employer may not retaliate against an employee who exercises his First Amendment speech rights."); *Markham v. White,* 172 F.3d 486, 491 (7th Cir.1999) ("The fact that arbitrary gender-based discrimination, including discrimination in an educational setting, violates the equal protection clause has been plain in this circuit for almost a decade and a half.")

■ A second possible argument is that it was not clearly established that refusing to renew a contract was an adverse employment action. However, defendants concede in their briefs that they are aware of no case in which a court has held that universities may discriminate or retaliate against employees in the context of renewing contracts. As noted above, the one case that defendants rely on is readily distinguishable, even assuming that it supports a conclusion that *nonrenewable*

contracts may not form the basis for a discrimination case under Title VII. The Court of Appeals for the Seventh Circuit has assumed in multiple cases brought under § 1983 that the refusal to renew a contract is an injury sufficient to trigger the protection of the Constitution, *see, e.g., Trejo,* 319 F.3d 878; *Griffin,* 795 F.2d 1281, as has the Supreme Court, *Ricks,* 449 U.S. 250, 101 S.Ct. 498. The courts' assumption supports a conclusion that it is clearly established that the Constitution applies to contract renewals, as do the legion of cases from other circuits that have held or assumed that this is the case. *Carter,* 349 F.3d 269; *Minshall,* 323 F.3d 1273; *Day,* 768 F.2d 696; *Fekade,* 167 F.Supp.2d 731; *see also Alexander v. DeAngelo,* 329 F.3d 912 (7th Cir.2003) ("[T]he absence of a previous decision establishing liability on the same facts is not critical; 'the easiest cases [for liability] don't even arise.'") (quoting *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

There is nothing new or novel about plaintiff's claims. If plaintiff can prove at trial that defendant Markee discriminated against her because of her race or sex or because she exercised her First Amendment rights, she will have proven that Markee violated clearly established law.

ORDER

IT IS ORDERED that

1. Plaintiff Sharon Walker's motion to strike the affidavits of Ann Lydecker and George Brooks is DENIED as unnecessary.

2. The motion filed by defendants Board of Regents of the University of Wisconsin System and David Markee to take judicial notice of the transcripts of the hearing before the State of Wisconsin Personnel Commission is GRANTED.

3. Defendants' motion for summary judgment is GRANTED with respect to

plaintiff's claim that defendant Markee retaliated against her for raising concerns about his reorganization plan, objecting to her exclusion from the investigation of an employee, objecting to the depiction of racial minorities in a newsletter and expressing her opinion on the university's policy about relationships between faculty and students. In all other respects, defendants' motion for summary judgment is DENIED.